(Nos. 74352, 74382, 74383 cons.—

*In re* GUARDIANSHIP OF CLIFFORD A. BABB (Glenn P. Babb, Guardian of the Person and Estate of Clifford A. Babb, Appellee, v. The City of Champaign, Appellee (Ed Roesch Equipment Company *et al.*, Appellants)).

*Opinion filed September 29, 1994.*

154

James C. Kearns, of Heyl, Royster, Voelker & Allen, of Urbana, for appellant Ed Roesch Equipment Co.

Lord, Bissell & Brook, of Chicago (R. Bruce Duffield,

Hugh C. Griffin and Diane I. Jennings, of counsel), for appellant Reach All.

Richard F. Record, Jr., and Mark R. Karpus, of Craig & Craig, of Mattoon, for appellant Goforth Industries, Inc.

Richard R. Harden, of Thomas, Mamer & Haughey, of Champaign, for appellee City of Champaign.

CHIEF JUSTICE BILANDIC delivered the opinion of the court:

This appeal arises from an order that the probate division of the circuit court of Champaign County entered in a guardianship proceeding. During the guardianship proceeding, the probate court entered an order in a related matter that approved a settlement agreement entered into between the estate of Clifford Babb and the City of Champaign. The probate court also entered a separate order (hereinafter, good-faith order) finding that the settlement agreement was made in good faith as required by the Joint Tortfeasor Contribution Act (Contribution Act) (740 ILCS 100/0.01 *et seq.* (West 1992)). Roesch Equipment Company, a potential defendant/third-party plaintiff, was allowed to intervene in the proceedings before the probate court. On appeal from the probate court's good-faith order, Reach All, Goforth Industries, Inc., Ford Motor Company, Sweeny Industries, Inc., and Parker Fluid Connectors were allowed to intervene in the appellate court proceedings. The appellate court affirmed the probate court's order approving the settlement agreement and finding that the settlement was made in good faith. (232 Ill. App. 3d 40.) We allowed the intervenors' petitions for leave to appeal (134 Ill. 2d R. 315).

## FACTS

The record reveals the following facts. On September 14, 1988, Clifford Babb was trimming trees in the course of his employment with the City of Champaign (City). Babb fell 20 to 40 feet from a cherry picker when the Ford truck supporting the cherry picker caught fire. (A cherry picker is a truck equipped with a device used to elevate workers above the ground so that they can perform tasks such as servicing electrical wires, trimming trees, etc.) The City owned the cherry picker. The City had purchased the Ford truck equipped with a Reach All bucket lift in April 1979 from Ed Roesch Equipment Company (Roesch). As a result of Babb's fall, the City, Babb's employer, became liable to Babb for workers' compensation benefits in the estimated amount of $2.4 million.

Due to Babb's disabling injuries, the probate court appointed Glenn Babb, Clifford Babb's father, as his legal guardian. During the guardianship proceedings before the probate court, Babb's estate filed a petition on March 13, 1990, seeking approval of a settlement agreement with the City. The petition alleged that the City agreed to pay $400,000 to Babb's estate. The settlement agreement would then release the City from secondary liability to any third parties. The probate court entered an order approving the settlement agreement.

On March 21, 1990, Babb's estate and the City filed a petition before the probate court asking that court to find that their settlement agreement was a "good-faith settlement" pursuant to section 2(c) of the Contribution Act (740 ILCS 100/2(c) (West 1992)). Notice of the petition was sent to counsel for Roesch, the company that sold the truck to the City. Roesch then sought leave to intervene in the probate action and to object to the petition for a good-faith finding. The probate court granted

Roesch's motion to intervene and withdrew its prior order approving the settlement agreement.

On June 4, 1990, Babb's estate and the City filed a second petition before the probate court for approval of the settlement agreement and a petition for a finding of good faith. The revised settlement agreement provided that the City would pay Babb $400,000 (hereinafter, settlement monies). Of that amount, $50,000 was Babb's to keep. However, if Babb should choose to file a tort action against any third parties and successfully recover any damages against potential third parties, he was to repay the City up to $350,000 of the $400,000 settlement monies. If his recovery against third parties was less than $350,000, then Babb was required to repay the City any amount actually received from third parties.

In addition to recovering up to $350,000 of the $400,000 settlement monies from any underlying tort judgment, the City would also retain its workers' compensation lien against Babb's recovery from third parties. This statutory lien would enable the City to recover from any judgment or settlement Babb might receive in the underlying tort action against third parties up to 75% of the $2.4 million it paid to Babb in workers' compensation benefits.

Further, the terms of the settlement agreement required Babb to waive his right to retain 25% of the workers' compensation benefits which are, by statute, allocated to the payment of attorney fees and costs incurred in the prosecution of an underlying tort action against third parties. (820 ILCS 305/1 *et seq.* (West 1992).) Therefore, the terms of the agreement allowed the City to recover from Babb 100% of its workers' compensation benefits (lien (75%) plus waiver of fees and costs (25%)) if Babb should successfully prosecute an underlying tort action. Additionally, the settlement agreement allowed the City to recover up to $350,000 of

the $400,000 settlement monies it paid if Babb should successfully prosecute an underlying tort action. The settlement agreement also included a clause requiring the City's consent prior to Babb's settlement with any third party. In this clause, the City was granted an unqualified right to withhold its consent to any third-party settlement unless it was fully indemnified by such agreement.

The probate court entered an order on June 7, 1990, approving the revised settlement agreement between Babb's estate and the City. In a separate order entered that same day, the court found that the settlement agreement was made in good faith for purposes of the Contribution Act. Roesch, as intervenor, filed a notice of appeal from the good-faith order on June 20, 1990.

On August 24, 1990, during the pendency of Roesch's appeal from the probate court's good-faith order, Babb filed a separate complaint in the circuit court. Babb's complaint, which sounded in products liability, named as defendants Roesch, Reach All, Goforth Industries, Inc., and Ford Motor Company. Thereafter, Sweeney Industries, Inc., Delta Mobile Testing, TBA Sales, and Parker Fluid Connectors were added as defendants. The defendants named in Babb's products liability complaint (hereinafter, tort action) filed third-party complaints against the City for contribution (hereinafter, the contribution action). The City, in turn, filed a motion to dismiss the contribution action on the ground that the settlement agreement approved by the probate court when it entered its good-faith order in the probate action relieved it of all liability for contribution to the defendants. Simultaneous to filing its motion to dismiss the contribution action, the City also filed a motion to stay proceedings in the tort action before the circuit court, pending appellate review of the probate court's good-faith order. The circuit court granted the

motion and stayed the tort action proceedings. Reach All, Goforth, Ford, Sweeney, and Parker (hereafter, defendant/intervenors) sought and were granted leave to intervene as appellants in Roesch's pending appeal from the probate court's good-faith order. The appellate court affirmed the probate court's good-faith order. (232 Ill. App. 3d 56.) As stated, we allowed the defendant/intervenors' petition for leave to appeal.

## ANALYSIS

### I. Prefatory Note

We initially note, for the sake of clarity, that the parties to this appeal are involved in three separate actions: (1) the probate action, wherein the probate court approved the settlement agreement between Babb's estate and the City and entered its good-faith order, finding that the settlement was made in good faith; (2) the tort action, which Babb instituted against eight separate defendants, six of whom also appeal from the good-faith order entered in the probate action (the defendant/appellants include Roesch, Reach All, Goforth Industries, Ford Motor Company, Sweeney Industries and Parker Fluid Connectors); and (3) the contribution action that the defendants in the tort action filed against the City. This appeal involves only the good-faith order entered in the probate action. The tort and contribution actions were stayed pending disposition of this appeal from the probate court's good-faith order.

The issue raised in this appeal is whether the probate court properly found that the settlement agreement between Babb's estate and the City was made in good faith within the meaning of the Contribution Act. All of the defendants argue that the trial court abused its discretion in finding the proposed settlement in "good faith" within the meaning of the Contribution Act. The defendant/intervenors, who did not receive no-

tice of the motion for a good-faith finding or the opportunity to participate in the hearing on that motion, argue that the manner in which the settling parties obtained the good-faith order demonstrates that the proposed settlement was not a "good-faith" settlement within the meaning of the Contribution Act. The defendant/intervenors and Roesch also argue that the proposed settlement, which incorporates a "loan-receipt" agreement, violates the policies underlying the Contribution Act and was not a good-faith settlement within the meaning of the Contribution Act (740 ILCS 100/2(c) (West 1992)).

## II. Good-Faith Settlement

### A. The Contribution Act

As stated, the probate court entered an order finding that the settlement between Babb and the City of Champaign was made in "good faith" within the meaning of the Contribution Act (740 ILCS 100/0.01 *et seq.* (West 1992)). That statute provides that, where two or more persons are "subject to liability in tort arising out of the same injury to person or property, or the same wrongful death, there is a right of contribution among them." (740 ILCS 100/2(a) (West 1992).) The right of contribution exists only in favor of a tortfeasor who has paid more than its *pro rata* share of damages to the injured party. (740 ILCS 100/2(b) (West 1992).) The Contribution Act provides, however, that a tortfeasor who settles in good faith with the injured party is discharged from contribution liability. Specifically, sections 2(c) and 2(d) of the Contribution Act provide:

"(c) When a release or covenant not to sue or not to enforce judgment is given in good faith to one or more persons liable in tort arising out of the same injury or the same wrongful death, it does not discharge any of the other tortfeasors from liability for the injury or wrongful death unless its terms so provide but it reduces the

recovery on any claim against the others to the extent of any amount stated in the release or the covenant, or in the amount of the consideration actually paid for it, whichever is greater.

(d) The tortfeasor who settles with a claimant pursuant to paragraph (c) is discharged from all liability for any contribution to any other tortfeasor." 740 ILCS 100/2(c), (d) (West 1992).

The only limitation that the Contribution Act places upon the parties' right to settle and thereby extinguish contribution liability is that the settlement must be accomplished in good faith. (740 ILCS 100/2(c) (West 1992).) The Contribution Act does not define the term "good faith." Although our courts have struggled to define that concept, no uniform definition has emerged. One appellate court panel determined that a settlement will be considered in good faith when no tortious or wrongful conduct on the part of the settling tortfeasor has been shown. (*Lowe v. Norfolk & Western Ry. Co.* (1984), 124 Ill. App. 3d 80, 94.) This definition is consistent with the commissioners' comments to the Uniform Contribution Among Joint Tortfeasors Act, which parallels our statute in many respects. (Uniform Contribution Among Tortfeasors Act, 12 U.L.A. 63, 100, Commissioners' Comments (1955) (clause requiring that a good-faith settlement was intended to give courts "occasion to determine whether the transaction was collusive," and if so, there was no discharge from contribution liability).) Other panels of the appellate court, however, preferred a broader definition, which considered not only whether the settlement was collusive, but also whether the amount paid by the settling tortfeasor was " 'within a reasonable range of the settlor's fair share.' " See *Wasmund v. Metropolitan Sanitary District* (1985), 135 Ill. App. 3d 926, 930, quoting *River Garden Farms, Inc. v. Superior Court* (1972), 26 Cal. App. 3d 986, 997-98, 103 Cal. Rptr. 498, 506-07; *Mallaney v. Dunaway* (1988), 178 Ill. App. 3d 827, 833.

In *Ballweg v. City of Springfield* (1986), 114 Ill. 2d 107, this court declined to place emphasis on any single factor as determinative of good faith. Instead, the court stated that in determining whether a settlement agreement was made in good faith, the trial court must consider the entire circumstances surrounding the settlement. (*Ballweg*, 114 Ill. 2d at 122-23.) This totality-of-the-circumstances analysis allows trial courts to give effect to the strong public policy favoring the peaceful settlement of claims. At the same time, the totality-of-the-circumstances analysis allows trial courts to be on guard for any type of evidence of collusion, unfair dealing or wrongful conduct by the settling parties. (See, e.g., *Blagg v. Illinois F.W.D. Truck & Equipment Co.* (1991), 143 Ill. 2d 188 (settling parties manipulated the settlement allocation to deprive the nonsettling employer of his workers' compensation lien); *Higginbottom v. Pillsbury Co.* (1992), 232 Ill. App. 3d 240 (settlement agreement between plaintiff/employee and third-party defendant/employer was not supported by consideration); but see *Wasmund v. Metropolitan Sanitary District* (1985), 135 Ill. App. 3d 926 (settlement found to be in good faith, even though settling parties were "friends" before settlement and husband and wife thereafter).) With this background in mind, we now address the issue of whether the trial court properly found that the instant settlement was made in good faith.

## B. Standard of Review

The trial court's finding that the instant settlement was made in good faith is a matter within that court's discretion. We will reverse such a finding only if the trial court has abused its discretion. (See *McDermott v. Metropolitan Sanitary District* (1992), 240 Ill. App. 3d 1, 44.) Applying the totality-of-the-circumstances analysis to the facts of this case, we consider the defendant/intervenors' challenges to the disputed settlement

agreement. Under the unique facts of this case, we find that the settlement was not made in good faith as required by the Contribution Act and, therefore, that the trial court's opposite finding was an abuse of discretion.

### C. Circumstances Surrounding the Settlement Agreement and the Good-Faith Order

Applying the totality-of-the-circumstances analysis to the facts here, one important circumstance that suggests that the settling parties were not acting in "good faith" is the manner in which they obtained approval of the settlement agreement and the good-faith order. The record reveals that the settling parties made a calculated effort to deprive the probate court of knowledge of the entire circumstances surrounding the settlement agreement. The record also reveals that the settling parties sought to obtain the good-faith order in a manner calculated to deprive nonsettling parties, whose contribution rights were cut off by such an order, of notice and the opportunity to object to a finding that the settlement agreement was made in good faith.

As stated, the parties sought a finding that their presuit settlement agreement was made in good faith even though Babb's estate had not yet filed a tort action against any potential defendants and no contribution action was yet pending against the City. In the ordinary case, the judiciary plays no role in presuit settlement agreements and the decision to settle rests solely in the discretion of the settling parties. If the parties to a presuit settlement want to obtain a "good-faith" order, they ordinarily must either wait until the injured party files a tort action or institute a declaratory judgment action (735 ILCS 5/2—701 (West 1992)) before they may ask the court to enter a good-faith finding. Under these ordinary circumstances, all potential parties would receive notice and an opportunity, at least, to intervene.

See 7 C. Nichols, Illinois Civil Practice § 6985, at 266 (rev. 1989) (all persons whose rights or liabilities may be affected by a declaratory judgment should be brought into the action, and those whose rights and liabilities will be necessarily affected, the indispensable parties, must be subjected to jurisdiction).

Here, however, a guardianship proceeding was pending in the probate court at the time the City and Babb's estate agreed to settle. Therefore, the settling parties had access to a forum where they could bring the settlement agreement to the attention of a trial court. The parties also chose that forum to seek a finding that the settlement agreement was made in good faith, and to thereby extinguish the City's potential contribution liability to nonsettling parties.

When the settling parties first brought the settlement agreement to the probate court's attention, however, they misrepresented the terms of the agreement. The petition to approve the settlement agreement simply alleged that Babb's estate agreed to release the City from secondary liability in exchange for payment of $400,000 from the City's insurer. The probate court entered an order approving the settlement based on the terms described in the petition.

It was only after the City filed a petition asking the probate court to enter a good-faith order that the actual terms of the settlement agreement were disclosed to the probate court. After reviewing the terms of the actual settlement agreement, the probate court sent letters to each party informing them that the agreement "was not fully—and in the court's view, adequately— described in the March 13 Petition for Approval to Settle." The probate court's letter pointed out that several parts of the actual settlement agreement had not been adequately described, including the clause containing loan-receipt provisions that required Babb's estate

to repay $350,000 of the $400,000 settlement figure. The letter concluded by stating that the probate court did not grant Babb's guardian approval to enter into the settlement agreement and would not decide whether the settlement was made in good faith.

The settling parties thereafter submitted a revised petition to approve the settlement and a petition for a good-faith finding to the probate court. Although the revised petition accurately described the terms of the settlement agreement, notice of the petition and of the motion for a good-faith finding was served only upon counsel for one potential defendant, Roesch. As stated, Roesch intervened in the proceeding before the probate court and strenuously objected to the petition for a good-faith finding.

The defendant/intervenors were not notified of the petition for a good-faith finding, however, even though the sole purpose of that finding was to extinguish the City's contribution liability to those same defendant/intervenors, whom the plaintiff planned to sue in the immediate future. Although no tort action was pending at the time of the good-faith hearing, the settling parties and the probate court were certainly aware of the fact that further litigation was contemplated. The petition to approve the settlement agreement alleged that Babb's estate's attorney intended to bring a tort action for Babb's injuries. Moreover, the record reveals that the settling parties knew the identity of the nonsettling tortfeasors whose right to contribution they sought to extinguish. The petition to approve the settlement agreement stated that potential defendants in the tort action included the manufacturer of, distributor of, modifier of, and suppliers of the truck from which Babb fell. These potential defendants were also identified in court at the hearing to approve the settlement agreement. In fact, shortly after obtaining the good-faith or-

der, Babb's estate's attorney filed a products liability action against those same defendants.

The defendant/intervenors, whose identity was known and whose right to contribution was purportedly extinguished by the good-faith order, had a financial stake in the amount of the settlement and, thus, a legitimate interest in receiving notice and an opportunity to challenge the petition for a good-faith finding. We find that the failure to notify them, in an attempt to prevent their objections to the petition for a good-faith finding, is a circumstance which suggests that the settling parties were not acting in good faith.

Our courts have held that a trial court has discretion to determine what procedure to follow when settling parties request a good-faith finding. In the ordinary case, the settling parties' desire to protect their own interests and a limited supervisory role by the trial court may be sufficient to prevent settlement agreements that are substantially unfair to nonsettling parties. The unique combination of factors in the instant case, however, is a circumstance that suggests a lack of good faith on the part of the settling parties. These factors include: (1) the fact that the settling parties sought a good-faith finding during the guardianship proceedings in the probate court, instead of instituting a declaratory judgment action or waiting until after the tort action was filed; (2) the fact that the settling parties misrepresented the terms of the settlement agreement to the probate court in the initial petition for approval of the settlement agreement; and (3) the fact that the settling parties failed to notify potential defendants whose right to contribution would be extinguished by the good-faith order, even though the parties knew the identity of those potential defendants and knew that litigation against such defendants was specifically contemplated in the future. As to this third factor, we find it significant that

such notice would have been given had the settling parties sought the good-faith order after a tort action or declaratory judgment action was filed.

The combination of these three factors is one circumstance that suggests that the settling parties were not acting in good faith. Because we are applying a totality-of-the-circumstances analysis, however, we do not rest our conclusion that the trial court abused its discretion in entering the good-faith order on this circumstance alone. Rather, other circumstances, including the inequitable terms included within the settlement agreement, also persuade us that the good-faith order was an abuse of discretion.

## D. Loan-Receipt Provision

### 1. *Historical Overview*

The defendant/intervenors and Roesch argue that the instant settlement may not be considered a "good-faith" settlement within the meaning of the Contribution Act because it incorporates a provision commonly known as a loan-receipt agreement. In addressing this argument, it is useful to consider the history of both the Contribution Act and loan-receipt agreements in Illinois.

Prior to 1977, our courts followed the common law rule prohibiting contribution among joint tortfeasors. (*Johnson v. Chicago & Pacific Elevator Co.* (1882), 105 Ill. 462; *Nelson v. Cook* (1856), 17 Ill. 443.) Thus, due to the doctrine of joint and several liability, a plaintiff could join all tortfeasors in a single action and execute the full amount of judgment against any one or more of the joint tortfeasors. The tortfeasor against whom a judgment was executed had no legal right to seek contribution from other joint tortfeasors (hereinafter, no-contribution rule). This common law rule was predicated on the notion that a wrongdoer had no right to seek judicial relief from his own wrongdoing. (See, *e.g.*,

*Johnson v. Chicago & Pacific Elevator Co.* (1882), 105 Ill. 462, 468 ("there is no right of contribution between wrong-doers").) The no-contribution rule resulted in harsh consequences to defendants. Because the doctrine of joint and several liability allowed the plaintiff to recover fully against any responsible party, the no-contribution rule permitted the " 'entire burden of a loss, for which two defendants were equally, unintentionally responsible, to be shouldered onto one alone, according to the accident of a successful levy of execution, the existence of liability insurance, the plaintiff's whim or spite, or his collusion with the other wrong-, doer, while the latter goes scot free.' " *Skinner v. Reed-Prentice Division Package Machinery Co.* (1977), 70 Ill. 2d 1, 13, quoting W. Prosser, Torts § 50, at 307 (4th ed. 1971).

As a method of mitigating the harsh effects that resulted from the inflexible and inequitable application of the common law bar to contribution, litigants began to employ settlement agreements commonly known as loan-receipt agreements. In the typical loan-receipt agreement, the plaintiff received an interest-free loan (settlement monies) from the settling tortfeasor, who was then dismissed from the plaintiff's tort action. Under the terms of the loan-receipt agreement, however, the plaintiff was obligated to repay the settlement monies received pursuant to the loan-receipt agreement to the settling tortfeasor out of any judgment or settlement that the plaintiff obtained from the other nonsettling tortfeasors. The loan-receipt agreement thereby allowed a settling tortfeasor to obtain contribution indirectly from other tortfeasors. The settling tortfeasor obtained contribution indirectly, because any money that the nonsettling tortfeasors paid to the plaintiff was immediately used to repay the settling tortfeasor for the amount it loaned to the plaintiff pursuant to the loan-receipt agreement.

In *Reese v. Chicago, Burlington & Quincy R.R. Co.* (1973), 55 Ill. 2d 356, this court upheld the use of loan-receipt agreements, reasoning that such agreements furthered the public policy of encouraging private settlement of litigation. The *Reese* court found that the policy considerations favoring private settlement of litigation outweighed the policy considerations underlying the common law rule barring contribution among joint tortfeasors.

The City argues that the *Reese* decision is controlling authority here, because that court upheld a settlement agreement that incorporated a loan-receipt provision, such as that employed in this case. We disagree. *Reese* considered the validity of loan-receipt agreements at a time when direct contribution among joint tortfeasors was prohibited. The court in *Reese* ultimately permitted the use of loan-receipt agreements because they allowed joint tortfeasors to avoid the harsh consequences, discussed earlier, that flowed from the common law rule barring contribution among joint tortfeasors. After *Reese* was decided, however, this court abolished the common law rule prohibiting contribution among joint tortfeasors. (*Skinner v. Reed-Prentice Division Package Machinery Co.* (1977), 70 Ill. 2d 1, 13.) The *Skinner* court created a contribution action in which liability for the plaintiff's injuries was to be apportioned among joint tortfeasors on the basis of their relative percentages of fault (*pro rata* share). (*Skinner*, 70 Ill. 2d at 14-16.) In *Skinner*, this court criticized both the common law rule barring contribution *and* the various devices created to mitigate the harsh consequences of that rule (*i.e.*, loan-receipt agreements). The court concluded that the bar to contribution was unjust because it required one tortfeasor to bear the entire burden for the plaintiff's loss, even though more than one party was at fault in causing the plaintiff's injury.

The court concluded that the devices created to mitigate the injustice of the common law rule barring contribution, such as implied indemnity and loan-receipt agreements, suffered from other infirmities. (*Skinner*, 70 Ill. 2d at 12.) The court specifically criticized loan-receipt agreements, finding that they "involve[d] the application of an all or nothing rule of liability to situations where some fault is attributable to both parties, and also raise[d] other problems." *Skinner*, 70 Ill. 2d at 12.

More importantly, *Reese* was decided before the legislature enacted the Contribution Act, which codified the *Skinner* holding. The Contribution Act specifies that a tortfeasor may be relieved of this contribution liability only if he or she enters into a "good-faith" settlement with the plaintiff. This court has never considered whether a settlement that incorporates a loan-receipt agreement may be considered a "good-faith" settlement within the meaning of the Contribution Act. Because *Reese* was decided before the legislature enacted the Contribution Act requiring good-faith settlements, that decision does not control the issue raised here, namely, whether a settlement that incorporates a loan-receipt agreement may constitute a "good-faith" settlement within the requirements of the Contribution Act.

As previously noted, in determining whether a particular settlement agreement was made in good faith, a court must consider the totality of the circumstances. Two factors that should be considered in this totality-of-the-circumstances analysis include: (1) whether the agreement is consistent with the terms of the Contribution Act; and (2) whether the agreement is consistent with the policies underlying the Contribution Act. An agreement that conflicts with the terms of and/or the policies underlying the Contribution Act does not satisfy the good-faith requirement and cannot discharge the settling tortfeasor from contribution liability.

The Contribution Act promotes two important policies. First, the Act encourages the equitable apportionment of damages by allowing for a right of contribution among joint tortfeasors when one tortfeasor pays more than his *pro rata* share of common liability. (740 ILCS 100/2(b) (West 1992).) The Act also ensures the equitable apportionment of damages between settling and nonsettling tortfeasors by providing that the amount that the plaintiff recovers on a claim against any other nonsettling tortfeasors will be reduced or set off by the amount stated in the settlement agreement between the plaintiff and the settling tortfeasor or the actual amount paid by the settling tortfeasor in consideration for the release of the settling tortfeasor from liability, whichever is greater (hereinafter, setoff right). (740 ILCS 100/2(c) (West 1992).) Second, the Act encourages tortfeasors to settle with an injured plaintiff by providing that a tortfeasor who enters into a good-faith settlement agreement with an injured party is discharged from contribution liability to any other tortfeasor. 740 ILCS 100/2(c), (d) (West 1992).

We conclude, for the reasons discussed below, that the instant settlement agreement, which incorporates a loan-receipt provision, may not be considered a good-faith settlement within the meaning of section 2(c) of the Contribution Act. We conclude that the loan-receipt provision within the settlement agreement is inconsistent with both the terms of Contribution Act and two purposes underlying that Act.

### 2. *Loan-Receipt Agreements Violate the Terms of the Contribution Act*

Loan-receipt agreements, such as the instant settlement agreement, may not be considered "good-faith" settlements because they violate the terms of the Contribution Act in two important respects. First, under the Contribution Act, a settling tortfeasor is prohibited

from recovering contribution from another tortfeasor whose liability is not extinguished by the settlement. (740 ILCS 100/2(e) (West 1992).) Loan-receipt agreements, however, allow a settling tortfeasor to subvert this portion of the Act by allowing the settling tortfeasor to obtain contribution indirectly from the nonsettling tortfeasor. The settling tortfeasor obtains indirect contribution because the plaintiff uses damages recovered from the nonsettling tortfeasor to repay the loan to the settling tortfeasor. (See *Henry v. St. John's Hospital* (1990), 138 Ill. 2d 533, 549.) Loan-receipt agreements therefore violate the terms of the Contribution Act by allowing a settling tortfeasor to accomplish indirectly that which is expressly forbidden by the Act.

In this respect, the instant settlement may be regarded as collusive, and thus not made in good faith. The settlement is collusive because it incorporates an agreement to obtain an object forbidden by law. The Contribution Act prohibits a settling tortfeasor from recovering contribution from another tortfeasor whose liability is not extinguished by the settlement. Here, however, the settlement allows the City to indirectly obtain contribution from the defendant/intervenors even though the settlement agreement did not extinguish their liability. See *In re Waverly Accident of February 22-24, 1978* (Tenn. 1979), 502 F. Supp. 1, 5.

More importantly, loan-receipt agreements such as the instant settlement violate the terms of the Contribution Act because they attempt to deprive the nonsettling tortfeasors of their statutory right to a setoff. As stated, section 2 of the Contribution Act specifies that, where a settlement is reached in good faith, the amount the plaintiff recovers on any claim against any other nonsettling tortfeasors will be reduced by the amount stated in the settlement agreement, or the amount of consideration actually paid by the settling tortfeasor,

whichever is greater. (740 ILCS 100/2(c) (West 1992).) This setoff provision protects nonsettling tortfeasors from paying more than their *pro rata* share of the final judgment for damages, and thereby promotes the Contribution Act's policy of equitably apportioning damages among joint tortfeasors. By providing for setoff rights, section 2 of the Contribution Act also reflects Illinois' public policy of protecting the financial interests of nonsettling tortfeasors. *Wilson v. Hoffman Group, Inc.* (1989), 131 Ill. 2d 308, 321-22.

In the instant case, the settling parties manipulated the terms of the settlement agreement to deprive the nonsettling tortfeasors (defendant/intervenors) of their right to a setoff. Under the terms of the settlement agreement, the City paid Babb $400,000 in settlement monies. The settlement agreement specified, however, that Babb's estate would repay $350,000 of the settlement monies to the City out of any amount that the estate might recover from other tortfeasors, specifically, the defendant/intervenors. As a result, any nonsettling tortfeasors would be entitled to only a $50,000 setoff, even though the City paid and the estate received $400,000 under the terms of the settlement agreement. (See *McDermott v. Metropolitan Sanitary District* (1992), 240 Ill. App. 3d 1, 47-48; *Johnson v. Belleville Radiologists, Ltd.* (1991), 221 Ill. App. 3d 100, 109.) Therefore, we find that the terms of the settlement agreement, under which the nonsettling tortfeasors are not entitled to a full setoff for the amount that the City paid in consideration for its release from liability, violate the terms of the Contribution Act.

This court has previously struck down a settlement agreement in which the settling parties manipulated the settlement allocation to deprive the nonsettling defendant of his right to a setoff. In *Blagg v. Illinois F.W.D. Truck & Equipment Co.* (1991), 143 Ill. 2d 188, an injured

plaintiff brought a products liability action against the manufacturer and distributor of the truck that allegedly caused his injuries. The plaintiff's spouse brought a loss of consortium action against the same defendants. The defendants then filed a third-party complaint for contribution against the plaintiff's employer. The employer, in turn, sought to impress a workers' compensation lien upon any recovery the plaintiff/employee might obtain from the defendants, pursuant to section 5(b) of the Workers' Compensation Act (820 ILCS 305/5(b) (West 1992)).

On the eve of trial, the plaintiffs settled with the defendant manufacturers. The settlement agreement allocated $350,000 to the spouse's loss of consortium claim, and only $100,000 to the plaintiff/employee's personal injury claim. At the hearing to determine whether the settlements were made in good faith, the plaintiff's employer objected to the allocation of the settlement proceeds. The employer argued that the settling parties were collusively attempting to circumvent the employer's workers' compensation lien, by allocating more money to the loss of consortium claim, to which the employer's lien did not attach. The trial court nevertheless found the settlement agreement was in good faith. The appellate court reversed the good-faith order, finding that the allocation of money in the settlement agreement represented an obvious attempt to circumvent the employer's workers' compensation lien. *Blagg v. Illinois F.W.D. Truck & Equipment Co.* (1989), 186 Ill. App. 3d 955, 963.

This court affirmed, stating that the settlement agreement, which placed the value of the spouse's consortium claim at more than three times the value of the plaintiff/employee's personal injuries "does not appear to be in good faith." (*Blagg*, 143 Ill. 2d at 195.) The *Blagg* court concluded that the settling parties'

attempt to allocate the settlement proceeds in a manner that thwarted the employer's lien indicated that the settlement agreement was not in good faith. *Blagg*, 143 Ill. 2d at 195.

The reasoning in *Blagg* applies equally here, where the injured plaintiff and the employer have manipulated the settlement award to deprive the nonsettling defendant/ intervenors of their right to a setoff. The loan-receipt provision in the settlement agreement deprives the nonsettling defendant/intervenors of their right to a setoff, and thereby directly contravenes the terms of the Contribution Act.

### 3. *Loan Receipt Agreements Violate the Two Policies Underlying the Contribution Act*

The instant loan-receipt agreement also undermines the two purposes underlying the Contribution Act. By depriving the defendant/intervenors of their right to a setoff, the loan-receipt agreement defeats the Contribution Act's purpose of equitably distributing among all joint tortfeasors the burden of compensating an injured plaintiff. Any recovery that Babb's estate might obtain from the defendant/intervenors in the tort action will be used first to repay the City for the settlement monies paid to the estate under the terms of the settlement agreement. As a result, the loan-receipt agreement simply shifts the City's share of liability to the defendant/intervenors. The defendant/intervenors will thereby be forced to pay more than their *pro rata* share of damages, but will have no recourse against the City, because the loan-receipt agreement, if found to be in good faith, discharges the City from contribution liability to the defendant/intervenors. (740 ILCS 100/ 2(d) (West 1992).) The instant loan-receipt agreement therefore allows the City to avoid paying its equitable share of the damages and frustrates one of the twin purposes underlying the Contribution Act.

We also find that the instant loan-receipt agreement frustrates the other purpose underlying the Contribution Act, that of encouraging settlement of claims. The public policy favoring settlement of claims recognizes that a tortfeasor should be able to "buy its peace" with the injured plaintiff, pay its money and be done with litigation. In this case, however, the City has not simply paid Babb's estate settlement monies and abandoned the litigation. On the contrary, the City wants to participate in and control the estate's action against the defendant/intervenors so that it may recover not only the workers' compensation benefits it paid to Babb, but also the settlement monies it "loaned" to him.

The settlement agreement frustrates the legislative goal of encouraging settlement because it grants the City control over what would otherwise be Babb's estate's unconditional right to settle with other tortfeasors and to determine the terms of such settlement agreements. The instant settlement agreement includes a clause requiring the estate to obtain the City's consent prior to entering into a settlement with any other tortfeasor. The agreement also provides that the City has an *unqualified* right to withhold consent unless it is fully indemnified by such agreement. In this respect, the agreement grants the City significantly more control over the settlement negotiations with the defendant/ intervenors than is generally accorded by statute to employers who hold workers' compensation liens. Section 5(b) of the Workers' Compensation Act provides that an employer's consent to a settlement agreement between the employee and a tortfeasor is not required when the employer is protected by court order. (820 ILCS 305/5(b) (West 1992).) By granting the City an unqualified right to prohibit Babb's estate from settling with any other party unless the agreement indemnifies the City for both its workers' compensation lien and the

settlement monies it loaned to the estate, the instant settlement agreement makes any future settlement with other tortfeasors unlikely, if not impossible. In essence, the agreement makes litigation inevitable because it grants the City the power to veto any proposed settlement between the estate and other remaining tortfeasors.

The instant settlement agreement also discourages future settlements because it allows the City, instead of Babb's estate, to dictate the terms of any settlement agreement between the estate and the remaining tortfeasors. Joint tortfeasors are unlikely to settle a claim on terms dictated by another settling tortfeasor. The instant settlement agreement therefore does not advance the policy of encouraging plaintiffs to settle their entire claims with all tortfeasors, to reduce litigation and to ease the burden on the courts. On the contrary, it is probable that the agreement will actually frustrate the legislature's goal of removing the entire litigation from the judicial system and thereby easing court congestion.

The City argues, however, that the court in *Reese v. Chicago, Burlington & Quincy R.R. Co.* (1973), 55 Ill. 2d 356, found that loan-receipt agreements promote private settlement of disputes. As noted earlier, however, *Reese* considered the validity of loan-receipt agreements before contribution among joint tortfeasors was allowed. The *Reese* court's conclusion that loan-receipt agreements encouraged settlement rested in large part upon the fact that such agreements allowed the settling tortfeasor to avoid the common law rule barring contribution and the harsh consequences that flowed from that rule. Because contribution among joint tortfeasors is now permitted under the Contribution Act, the validity of the *Reese* court's conclusion that loan-receipt agreements promote settlements must be reconsidered.

It is possible that the allowance of loan-receipt agreements encourages early settlements between the plaintiff and a single tortfeasor. The injured plaintiff has a strong monetary interest in getting cash up front to offset the immediate economic loss resulting from his or her injuries and to underwrite the costs of the underlying tort litigation. A tortfeasor is likely to prefer a loan-receipt agreement to an ordinary settlement agreement. The amount of money that a tortfeasor pays to an injured plaintiff in an ordinary settlement agreement is lost forever. A settlement agreement that incorporates a loan-receipt provision, on the other hand, releases the settling tortfeasor from all liability, but permits him or her to recover the amount of money paid to the plaintiff to settle the claim. The amount paid in settlement is simply a "loan" that the injured plaintiff must repay if he or she recovers from other nonsettling tortfeasors. Thus, a joint tortfeasor would obviously prefer a settlement agreement that incorporates a loan-receipt provision, because such agreements permit the joint tortfeasor to recapture any settlement monies it has paid, and thus effectively to escape liability for the plaintiff's injuries without suffering any financial loss for those injuries.

Loan-receipt agreements, however, rarely further the legislature's intent to encourage settlement of the *entire* litigation. As Justice Schaefer pointed out in his dissenting opinion in *Reese*, the joint tortfeasor most likely to enter into a loan-receipt agreement with the plaintiff is the one who is the most blameworthy. (*Reese*, 55 Ill. 2d at 367 (Schaefer, J., dissenting, joined by Ward and Ryan, JJ.).) This is so because the more blameworthy tortfeasor would be willing to offer a larger loan to the plaintiff in order to settle and thereby escape potential liability it may be exposed to at trial. At the same time, the more blameworthy tortfeasor retains the right to

reimbursement of the loan from the amount recovered pursuant to a tort judgment against the less blameworthy tortfeasor.

Because the plaintiff must repay the amount of the loan to the settling tortfeasor, the remaining tortfeasors necessarily must bear a larger share of the plaintiff's damages than might be warranted by an analysis of comparative fault. The plaintiff must insist on higher settlement figures from the remaining tortfeasors to obtain full compensation for his loss, because the plaintiff must repay the loan amount. Consequently, the remaining tortfeasors are *less* likely to settle, since they have little to lose by taking the matter to trial. Thus, loan-receipt agreements undermine, rather than promote, the private settlement of disputes. In sum, we conclude that loan receipt agreements frustrate both of the policies underlying the Contribution Act.

### III. Conclusion

Because loan-receipt agreements violate the terms of and the policies underlying the Contribution Act, we conclude that such agreements may not be considered "good-faith" settlements within the meaning of the Contribution Act. We recognize, however, that our decision overrules past precedent upon which litigants may have justifiably relied. We therefore conclude that it is equitable to apply our holding prospectively only. (See *Sunich v. Chicago & North Western Transportation Co.* (1985), 106 Ill. 2d 538, 543-45; *In re Estate of Swiecicki* (1985), 106 Ill. 2d 111, 123.) Consequently, our conclusion that loan-receipt agreements may not be considered good-faith settlements within the meaning of the Contribution Act will apply only to this case and to all settlement agreements executed after the date of the filing of this opinion, September 29, 1994.

Because the instant settlement agreement incorporates a loan-receipt agreement, it may not be considered

a good-faith settlement and does not relieve the City of its contribution obligation. We note, however, that the City's contribution liability is limited, under this court's decision in *Kotecki v. Cyclops Welding Co.* (1991), 146 Ill. 2d 155, to an amount no greater than its workers' compensation liability to Babb. See also *Lannom v. Kosco* (1994), 158 Ill. 2d 535 (*Kotecki* applies retroactively).

For the reasons discussed above, we reverse the probate court's order finding that the settlement agreement between the City and Babb's estate was made in good faith. We also reverse the appellate court's decision affirming the probate court's good-faith order. We reverse and remand this cause to the trial court for further proceedings consistent with this opinion.

*Appellate court reversed;*
*circuit court reversed;*
*cause remanded.*