FOURTH DIVISION
June 19, 2008

Nos. 1-05-3721 and 1-06-2967 (Consolidated)

| | | |
|---|---|---|
| JOSEPH PECORARO, | ) | Appeal from the Circuit Court of |
| | ) | Cook County, Illinois |
| Plaintiff-Appellant, | ) | |
| | ) | No.  00 L 11852 |
| v. | ) | |
| | ) | Honorable Richard J. Elrod, |
| JAMES W. BALKONIS, EDWARD J. PUDLO, | ) | Judge Presiding |
| FRANK BISKNER, MATTHEW M. SPRENZEL, | ) | |
| KENNETH J. NORDGREN, WILLIAM D. | ) | |
| DeGIRONEMO, and JAMES LAPETINA, | ) | |
| | ) | |
| Defendants-Appellees, | ) | |
| | ) | |
| (Thomas Olsak and Fremd High School | ) | |
| Hockey Club, Defendants). | ) | |
| | ) | |
| | ) | |
| JOSEPH PECORARO, | ) | |
| | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| FREMD HIGH SCHOOL HOCKEY CLUB, | ) | |
| | ) | |
| Defendant and Third-Party | ) | |
| Plaintiff-Appellant, | ) | |
| | ) | |
| (Thomas Olsak, | ) | |
| Defendant and Third-Party Defendant). | ) | |

JUSTICE MURPHY delivered the opinion of the court:

1-05-3721 and 1-06-2967 (Cons.)

Plaintiff, Joseph Pecoraro, brought an action against defendants, James W. Balkonis, Edward J. Pudlo, Frank Biskner, Matthew M. Sprenzel, Kenneth J. Nordgren, William D. DeGironemo, and James Lapetina, members of the board of governors of the Fremd High School Hockey Club (individual board members), alleging that they were negligent when they failed to control Thomas Olsak, a 17-year-old hockey player, who assaulted plaintiff after plaintiff told him he could not play in a hockey game. The trial court dismissed count II on the basis that the individual board members did not authorize or ratify Olsak's conduct. In appeal No. 1-05-3721, plaintiff appeals the dismissal of the individual board members. In appeal No. 1-06-2967, the hockey club appeals the trial court's finding that a settlement between plaintiff and Olsak was in good faith.

## I. BACKGROUND

### A. Allegations of the Complaint

Plaintiff filed a suit against Olsak, his stepfather, Edward Pudlo, and the Fremd High School Hockey Club (hockey club) after a confrontation between plaintiff and Olsak left plaintiff severely injured. Plaintiff later amended his complaint to add the individual members of the board of governors of the hockey club.

Plaintiff's third amended complaint alleges as follows. On October 21, 1998, plaintiff was the head coach of the hockey club's varsity team. Olsak, a 17-year-old player, had deliberately missed two consecutive conditioning sessions earlier in the week, in violation of team practice rules, so he knew he would not be allowed to play in the game that night. However, he reported to the locker room and dressed in his hockey equipment for the purpose of

-2-

triggering a confrontation with plaintiff. When plaintiff entered the locker room, a verbal confrontation ensued, and when plaintiff walked away, Olsak followed and threw a hockey stick at his back. As plaintiff turned around, Olsak struck him in the temple. Plaintiff stiffened and fell backwards, striking his head on the concrete floor. He suffered serious head injuries, was in a coma for several days, and sustained permanent brain damage, including the loss of certain sensory and cognitive functions.

The hockey club is an association that operates and manages a high-school hockey team. It is a private not-for-profit but is not organized as such under the laws of Illinois. It is organized under the Amateur Hockey Association Illinois, Inc. (AHAI), which is recognized by USA Hockey, the governing body of American Ice Hockey, as its sanctioned affiliate. USA Hockey promulgated rule books containing play rules and bylaws that must be followed by AHAI, member teams, and all participants. Similarly, AHAI promulgated policies, bylaws, and rules that must be followed by all Illinois leagues, member teams, and participants. The hockey club had an obligation, as an AHAI member team, to follow and enforce AHAI policies and bylaws as they applied to board members, coaches, and players, specifically, the "obligation to prevent physical abuse and fighting as required by AHAI policies."

Count I alleges assault and battery against Olsak, and count III alleges negligence against Pudlo, Olsak's stepfather. In count IV, plaintiff alleged that the hockey club was liable pursuant to the doctrine of *respondeat superior* because Olsak was a servant of the hockey club at the time of the incident. Count V alleges negligence against the individual board members under the

1-05-3721 and 1-06-2967 (Cons.)

Sports Volunteer Immunity Act (745 ILCS 80/1(a) (West 2004)).[1]

Count II alleged negligence on the part of the hockey club and the individual board members. The hockey club and individual board members were obligated to observe, adopt, and follow the affiliate guidelines contained in article XIX of the AHAI rules and regulations. The hockey club and individual board members created several committees, including, for example, the player recruiting and retention committee, the coaching and staffing committee, and the disciplinary committee, to discharge the club's obligations under AHAI and league rules. The hockey club and its individual board members had control and authority over the players with respect to hockey activities and had the authority to provide direction, manage, enact rules and regulations, and suspend and discipline players. They had a duty to plaintiff to provide a safe environment within which to perform his coaching duties and to protect him from harm and abuse from the players during hockey-related activities.

The board knew of the following through Pudlo: (1) Olsak had received disciplinary action in school on March 4, 1998, for breaking a ceiling tile by hitting it with his hand, and (2) Olsak had received disciplinary action in school on March 5, 1998, for "destructive, dangerous, and disruptive behavior after repeated warnings" in the classroom. The board also knew, through Pudlo or other "individual defendant members of the Board," that in late February or early March

---

[1] Count I was dismissed when Olsak settled with plaintiff. As discussed below, the hockey club is appealing the approval of that settlement. Counts III and V were dismissed with prejudice; their dismissals are not being appealed. Count IV apparently continues in the trial court and is not relevant to this appeal.

1998, Olsak was assessed a major penalty for assaulting and fighting a player on the opposing team during a game.  It knew, through the individual board defendants, that: (1) Olsak received an inordinately high number of penalty minutes during the 1997-98 season for violating playing rules promulgated by USA Hockey, and (2) Olsak had made disrespectful and combative comments to plaintiff and other assistant coaches before the incident in question.  Finally, the hockey club and the individual board defendants knew or should have known that Olsak had violent propensities and showed an inability to exercise self-discipline and anger management on several occasions before the incident.

The hockey club and individual board members breached their duty to plaintiff by failing to (1) define, implement, and execute policies relating to the enforcement of team rules that were to be followed by the players; (2) prevent Olsak from dressing in his hockey equipment on October 21, 1998; (3) define and implement policies and procedures that would have required Edward Pudlo, the manager, to serve as a liaison between the coached and players to prevent abusive contact toward coaches; (4) hold a disciplinary hearing and investigate the incidents of violent behavior demonstrated by Olsak to prevent further acts of violence, intimidation, or abuse; (5) discipline or suspend Olsak from hockey before October 21, 1998; (6) advise the AHAI of the problem of potential abuse posed by Olsak in violation of AHAI rules; and (7) draft and implement a constitution, bylaws, and rules and regulations for the players, parents, and coaches as required by AHAI rules and regulations.  The third amended complaint alleges that the failure of the board and its individual members to effectively manage and control Olsak caused plaintiff's injuries.

1-05-3721 and 1-06-2967 (Cons.)

B. Proceedings in the Trial Court

On October 9, 2001, defendants filed a motion to dismiss count II of the second amended complaint pursuant to section 2-619 of the Code of Civil Procedure (735 ILCS 5/2-619 (West 2004)) based on the General Not For Profit Corporation Act of 1986 (General Not-For-Profit Act) (805 ILCS 105/108.70(a) (West 2004)) and the Sports Volunteer Immunity Act (745 ILCS 80/1(a) (West 2004)). Judge Bronstein denied the motion because at the time of the incident the hockey club was not registered with the state as a not-for-profit as required by the General Not-For-Profit Act. Defendants then filed an answer to the complaint.

In 2003, the club and the Fremd defendants filed a motion for summary judgment on count II of the complaint, arguing that (1) they did not have a duty to control Olsak's conduct because there was not a special relationship between them and Olsak, (2) they did not have a duty to protect plaintiff from Olsak's unforeseeable, criminal attack, and (3) AHAI rules did not create a duty owed by defendants to plaintiff. Plaintiff responded that there was a master-servant relationship between Olsak and the board and that they voluntarily assumed a duty. Judge Hogan stated that "there's no duty to the plaintiff on an individual basis. The only duty on behalf of these individuals stems from the relationship they had with respect to the board. *** [I]f you get a verdict against the board, that doesn't mean that you get a verdict against these people individually." He denied the motion but noted that the individual board members could "only be found responsible based on what they did with respect to their board actions."

The case was assigned to Judge Elrod for trial on September 1, 2004, and in March 2005, the Fremd defendants filed a second motion for summary judgment on count II. Defendants

-6-

again argued that the Sports Volunteer Immunity Act precluded count II. In light of this motion, plaintiff was permitted to file a third amended complaint, and defendants' motion was denied.

In June 2005, plaintiff filed a motion for partial summary judgment on counts II and IV as to the existence of a master-servant relationship between the board and Olsak, which the trial court denied. During the hearing addressing plaintiff's motion for partial summary judgment, Judge Elrod also discussed the liability of the individual board members. During the hearing, plaintiff stated that when negligence is imputed on the club, it is automatically assumed by each of the board members. Judge Elrod ruled that pursuant to *Joseph v. Collis*, 272 Ill. App. 3d 200 (1995), individual board members are not personally liable for the tortious conduct of other board members unless they perform individual acts of negligence or ratify the board's acts of negligence. Therefore, the trial court stated, the failure to implement policies was on the part of the club, not the individuals. Accordingly, the trial court *sua sponte* directed defendants to file a motion to dismiss count II.

Defendants filed such a motion, and the individual board members were dismissed as defendants on October 12, 2005. On November 10, 2005, the trial court granted plaintiff's motion for a Supreme Court Rule 304(a) (210 Ill. 2d R. 304(a)) finding regarding the dismissal of board members as defendants and denied his motion for a Supreme Court Rule 308 (155 Ill. 2d R. 308) certification regarding the denial of plaintiff's motion for partial summary judgment.

### C. Settlement

The hockey club and individual board members filed a contribution claim against Olsak. In June 2006, plaintiff settled his assault and battery claim against Olsak. The settlement

agreement provides that Olsak will pay plaintiff $5,000 and assign him all of his rights under insurance policies from two companies: (1) Country Mutual Insurance Company policies issued to Olsak's mother and stepfather, and (2) a TIG Insurance Company policy in which the hockey club and its members were insureds. Country Mutual had filed a declaratory judgment action seeking a declaration that it had no obligation to defend or indemnify him in this action, and TIG defended the hockey club and the individual board members but did not defend Olsak. The settlement agreement stated that Olsak, who did not have "any substantial assets with which to pay any judgment or settlement" to plaintiff, had potential claims against the insurers for denying him a defense. Furthermore, paragraph 2.4 of the settlement agreement provided that Olsak will receive 5% of any recovery obtained from Country Mutual or TIG.

Plaintiff and Olsak filed a joint motion for a good-faith finding regarding the settlement pursuant to the Joint Tortfeasor Contribution Act (740 ILCS 100/2 (West 2004)). The trial court found that the settlement was in good faith "with 2.4 eliminated," as Olsak should not be able to receive funds for his own alleged wrongdoing. Accordingly, the trial court dismissed plaintiff's claims against Olsak and the hockey club's contribution claim against Olsak. The court found, pursuant to Rule 304(a), that there was no just reason for delaying the enforcement or appeal of the order. This appeal followed.

## II. ANALYSIS

### A. Motion to Dismiss

#### 1. *Standard of Review*

A motion to dismiss pursuant to section 2-615 attacks the legal sufficiency of the

1-05-3721 and 1-06-2967 (Cons.)

complaint. *R & B Kapital Development, LLC v. North Shore Community Bank & Trust Co.*, 358 Ill. App. 3d 912, 920 (2005). A court reviewing an order granting a section 2-615 motion takes all well-pled facts as true. *R & B*, 358 Ill. App. 3d at 920. On review of a section 2-615 dismissal, the court must determine whether the allegations of the complaint, when interpreted in the light most favorable to the plaintiff, sufficiently set forth a cause of action on which relief may be granted. *R & B*, 358 Ill. App. 3d at 920. A dismissal pursuant to section 2-615 is reviewed *de novo*. *Collins v. Superior Air-Ground Ambulance Service, Inc.*, 338 Ill. App. 3d 812, 815 (2003).

Citing *Adcock v. Brakegate, Ltd.*, 164 Ill. 2d 54 (1994), plaintiff argues that a different standard applies here because defendant waived any defect in the pleading by filing an answer to the second amended complaint. In *Adcock*, when the defendant's motion to strike and dismiss the complaint was denied, it filed an answer denying the allegations of the complaint. The action proceeded, and later the defendant refused to obey a court order compelling it to produce to witnesses. The trial court punished the defendant by entering a judgment of liability against it as a sanction, and the case then proceeded to trial. On appeal, the defendant abandoned its claim that the sanction was too harsh and instead argued that the complaint was insufficient. Our supreme court held, however, that the defendant waived such a claim because it elected to file an answer to the complaint after its motion to dismiss was denied, and the jury verdict against the defendant cured any defects in the complaint. *Adcock*, 164 Ill. 2d at 61. While a defendant may raise a claim at any time that the complaint fails to state a cause of action, this "exception does not apply where the complaint states a recognized cause of action but contains an incomplete or

1-05-3721 and 1-06-2967 (Cons.)

otherwise insufficient statement of that cause of action." *Adcock*, 164 Ill. 2d at 61-62.

We disagree with plaintiff. The defendant in *Adcock* filed a motion to dismiss and an answer against the same version of the complaint. Here, the individual board members filed an answer to the second amended complaint and a motion to dismiss the third amended complaint. Therefore, they did not waive defects in the third amended complaint.

### 2. *Whether Joseph v. Collis Precludes Plaintiff's Claim*

The trial court, relying on *Joseph v. Collis*, 272 Ill. App. 3d 200 (1995), ruled that to hold individual board members liable, plaintiff had to allege specific acts of negligence on the part of the individuals or the ratification of the club's negligence. In *Joseph*, a voluntary committee of eight people associated to oppose a referendum question. The plaintiffs filed a complaint alleging that three committee members made defamatory statements " 'individually and on behalf of' " the other committee members. *Joseph*, 272 Ill. App. 3d at 203. On appeal, the plaintiffs argued that the trial court erred when it dismissed their complaint against the committee members who did not individually make the defamatory statements. The court found that there was no legal basis for recovery against the defendants for the statements of other committee members simply by virtue of membership on the committee. *Joseph*, 272 Ill. App. 3d at 207.

The court noted, "The narrow issue of whether a member of a voluntary unincorporated association may be held vicariously liable for the defamatory statement(s) of another member of the association by virtue of mere membership in the association is one of first impression in Illinois." *Joseph*, 272 Ill. App. 3d at 208. It found the answer to this issue to turn on whether "the voluntary unincorporated association is organized for profit." *Joseph*, 272 Ill. App. 3d at

-10-

208. Since it was not alleged that the committee was organized for profit, partnership law did not apply. Rather, the court applied principles of agency law and found the proposition that a member of a nonprofit voluntary unincorporated association is not liable for the torts of a fellow member in the absence of (1) authorization or ratification of the tortious conduct or (2) active participation in the tortious conduct to be "rational and just." *Joseph*, 272 Ill. App. 3d at 208. Because there were no allegations that the other board members authorized or ratified the defamatory statements, the members who made the statements were not the agents of the other board members. *Joseph*, 272 Ill. App. 3d at 208-09. Accordingly, the other board members could not be held liable for those statements "without their direct participation, authorization, or subsequent ratification." *Joseph*, 272 Ill. App. 3d at 209.

Similarly, according to *Corpus Juris Secundum*, a "nonprofit association" means an unincorporated organization consisting of two or more members by mutual consent for a common, nonprofit purpose. 7 C.J.S. Associations §3 (2004). "When a voluntary association is *** organized for profit, the members are not viewed as partners, and no agency is implied from mere fact of association." 7 C.J.S. Associations §3 (2004). "The mere fact of membership in an association is not of itself a sufficient basis for the tort liability of individual members for the wrongful acts or omissions of an association or its agents, and liability may be required to be predicated on participation in the activities of the association or in the tortious conduct." 7 C.J.S. Associations §70 (2004). See also *Juhl v. Airington*, 936 S.W.2d 640, 642 (Tex. 1996) ("the individual liability of a member will be based on their actual participation in the tort or ratification of the actions [that] cause injury"); *Victory Committee v. Genesis Convention Center*,

1-05-3721 and 1-06-2967 (Cons.)

597 N.E.2d 361, 364 (Ind. App. 1992) (members of a not-for-profit unincorporated association are liable for the obligations incurred by the association under a contract if the members authorize the contract or subsequently ratify its terms); *Lyons v. American Legion Post No. 650 Realty Co.*, 172 Ohio St. 331, 175 N.E.2d 733 (1961); *Security-First National Bank of Los Angeles v. Cooper*, 62 Cal. App. 2d 653, 145 P.2d 722 (1944); *Stone v. Guth*, 232 Mo. App. 217, 102 S.W.2d 738 (1937).      Plaintiff first argues that "it cannot be assumed" that the hockey club was in fact a not-for-profit unincorporated association.  However, the complaint alleges that the hockey club was a not-for-profit association.  Accordingly, in a section 2-615 motion, we reject his argument.  *R & B*, 358 Ill. App. 3d at 920.

Plaintiff argues that *Joseph* is distinguishable because the committee in that case did not have officers and directors, and the individual members did not obligate themselves to follow the bylaws and rules of the association or of a regional or national governing body.  He also contends that *Joseph* does not apply because the complaint does not allege that one member is liable simply by virtue of membership on the board.  Rather, the complaint sufficiently alleges "acts or omissions on the part of each individual defendant, as an officer or director."  The complaint alleges that "the defendant Fremd Hockey Board, through its officer and manager defendant Edward Pudlo," knew that Olsak had received disciplinary action at school for breaking a ceiling tile and engaging in "destructive, dangerous, and disruptive behavior after repeated warnings" in the classroom.  It further alleges that "the defendant Fremd Hockey Board, through its officer and manager defendant Edward Pudlo, and other individual members of the Board," knew that Olsak was assessed either a major penalty or a game misconduct penalty for assaulting and fighting a

-12-

player on the opposing team during a hockey game the previous season. These allegations demonstrate direct knowledge only by specific individuals, either Pudlo or "other individual members of the Board," which plaintiff attempts to impute on the entire board. To the extent that plaintiff attempts to hold other members of the board liable, *Joseph* precludes him from doing so. Where there are no allegations of the other board members' direct knowledge of these events, there can be no "direct participation," nor are there any allegations of "authorization or subsequent ratification." See *Joseph*, 272 Ill. App. 3d at 209.

Paragraphs 37 through 39 of count II allege that the hockey club, "through its individual Board defendants," knew that Olsak received an inordinately high number of penalty minutes during the 1997-98 season and made disrespectful and combative comments to plaintiff and other assistant coaches before the incident. The club and individual board members also knew or should have known that Olsak "had violent propensities and showed an inability to exercise self-discipline and anger management." However, the complaint does not specify what each individual person, as opposed to the conglomerate "individual board members," did or failed to do. Furthermore, knowledge alone cannot constitute participation, authorization, or ratification of the negligent acts.

The complaint alleges that the club and the individual board members breached their duty by, *inter alia*, failing to implement various policies and procedures, to hold a disciplinary hearing to investigate earlier incidents of violent behavior, or suspend Olsak before the assault. Therefore, while certain portions of the complaint seem to impute knowledge on individual board members, other parts allege their direct participation in the tort, in that they knew of Olsak's

violent propensities and failed to suspend or otherwise control him. However, aggregating the "individual board members" without distinguishing what particular person(s) of the seven performed what particular acts or omissions poses the danger that *Joseph* seeks to avoid: imposing individual liability on all individual board members for what could be the actions of just a few. Therefore, we find that plaintiff's allegations regarding whether "individual board members" performed certain acts or omissions are not adequately pled.

Finally, plaintiff argues that *Joseph* is inconsistent with Illinois law abolishing charitable immunity (see *Darling v. Charleston Community Memorial Hospital*, 33 Ill. 2d 326 (1965)) because it creates an "express exception" to the rule. The legislature has established immunity for directors or officers of not-for-profit corporations (see 805 ILCS 105/108.70 (West 2004)) and for managers, directors, and coaches in an amateur sports program of a nonprofit association (see 745 ILCS 80/1 (West 2004)). However, the trial court determined that defendants did not enjoy immunity under the Sports Volunteer Immunity Act because the club failed to register as an Illinois not-for-profit corporation or unincorporated association. According to plaintiff, where defendants failed to comply with the requirements to obtain statutory immunity, they would be rewarded with the application of *Joseph*, which has granted them "with a charitable immunity."

Plaintiff contends that if *Joseph* "is allowed to apply to its fullest extent," an influx of "self-proclaimed charity-oriented groups" will claim "*Joseph* immunity" from the negligence of their officers, directors, or agents without complying with the requirements of statutory immunity or procuring insurance. Despite plaintiff's prognostications, in the 16 years since *Joseph* was decided, not a single case has relied on it for the concept of immunity. This is because *Joseph*

has nothing to with immunity. *Joseph* simply requires that the defendant-member somehow participate in the tort before making him liable for the torts of other members, while immunity would immunize the person in the event that he did participate.

Therefore, we affirm the trial court's dismissal of count II. In light of this ruling, we decline to address plaintiff's arguments that a master-servant relationship exists between the hockey club and Olsak and that the individual board members had a duty to protect him.

### B. Settlement

The hockey club contends that the trial court erred in finding that the settlement agreement was in good faith. The settling party carries the initial burden of making a preliminary showing of good faith. *Johnson v. United Airlines*, 203 Ill. 2d 121, 132 (2003). "At a minimum, the settling parties must show the existence of a legally valid settlement agreement." *Johnson*, 203 Ill. 2d at 132. Once a preliminary showing of good faith has been made, the party challenging the good faith of the settlement must prove the absence of good faith by a preponderance of the evidence. *Johnson*, 203 Ill. 2d at 132.

"The 'good faith' of a settlement is the only limitation [that] the Act places on the right to settle and it is the good-faith nature of a settlement that extinguishes the contribution liability of the settling tortfeasor." *Johnson*, 203 Ill. 2d at 128; 740 ILCS 100/2(d) (West 2004). The Act does not define "good faith"; however, our supreme court has noted that a settlement will not be found to be in good faith if it is shown that the settling parties engaged in wrongful conduct, collusion, or fraud. *Johnson*, 203 Ill. 2d at 134. Nor will a settlement satisfy the good-faith requirement if it conflicts with the terms of the Act or is inconsistent with the policies underlying

the Act. *Johnson*, 203 Ill. 2d at 134. "Ultimately, however, whether a settlement satisfies the good-faith requirement *** is a matter left to the discretion of the trial court based upon the court's consideration of the totality of the circumstances." *Johnson*, 203 Ill. 2d at 135.

"The policy of the Contribution Act is to encourage compromise and settlement in the absence of bad faith, fraud[,] or collusion." *Orejel v. York International Corp.*, 287 Ill. App. 3d 592, 601 (1997). The hockey club, however, does not allege that there was evidence of collusion, unfair dealing, or wrongful conduct of the settling parties. See *In re Guardianship of Babb*, 162 Ill. 2d 153 (1994); *BHI Corp. v. Litgen Concrete Cutting & Coring Co.*, 346 Ill. App. 3d 300, 306 (2004). Instead, it argues that the amount of the settlement is inadequate. The settlement amount is $5,000 plus the value of Olsak's causes of action against Country Mutual and TIG. The hockey club argues that the assignment of rights was illusory because a trial court determined that Country Mutual owes no coverage to Olsak for his intentional act because his conduct fell within the intentional-act exclusion of the policy,[2] and while the TIG policy is not in the record, "it is reasonable to conclude that it has a similar intentional act exclusion." The hockey club notes that Olsak, who pled guilty to battery, admitted to punching plaintiff, although he claimed that plaintiff had been verbally abusive. The hockey club concludes that the settlement amount is inadequate in light of plaintiff's claimed economic losses in the amount of $800,000 and his extensive physical injuries.

"The amount of a settlement must be viewed in relation to the probability of recovery, the defenses raised, and the settling party's potential legal liability." *Johnson*, 203 Ill. 2d at 137.

_____

[2] That ruling is being appealed in docket No. 1-07-2273.

The disparity between the settlement amount and the *ad damnum* in the complaint is not an accurate measure of the good faith of the settlement, nor does the small amount of the settlement, alone, require a finding of bad faith. *Johnson*, 203 Ill. 2d at 136-37; *Skaggs v. Senior Services of Central Illinois, Inc.*, 355 Ill. App. 3d 1120, 1126 (2005). While the hockey club emphasizes that the supreme court in *Johnson* noted that the small amount of the settlement, "alone," does not require a finding of bad faith (*Johnson*, 203 Ill. 2d at 136-37), it does not allege anything beyond the inadequacy of the settlement amount, in light of Olsak's "obvious liability." The hockey club does not argue that there was evidence of collusion, unfair dealing, or wrongful conduct of the settling parties. See *In re Guardianship of Babb*, 162 Ill. 2d 153 (1994); *BHI Corp. v. Litgen Concrete Cutting & Coring Co.*, 346 Ill. App. 3d 300, 306 (2004).

While $5,000 and an assignment of claims against the insurance companies seem to be a small amount for intentionally punching someone in the head and causing extensive injuries, Olsak's attorney stated in his affidavit that he conducted an asset search of Oslak and found that he has no assets of consequence. According to the attorney, even if a judgment in a significant amount is rendered against Olsak, there is "little or no probability" that Olsak could ever satisfy it. Olsak stated in his affidavit that he has no assets "of a material nature" and that even the $5,000 payment will be difficult for him to make. Where affidavits averred that Olsak, who was only 17 years old at the time of the incident, had few assets, and the trial court refused to approve the paragraph of the agreement that gave Olsak 5% of any recovery obtained from the insurers, we conclude that the trial court did not abuse its discretion when it found that the settlement agreement was in good faith.

### III. CONCLUSION

For the foregoing reasons, we affirm the decisions of the trial court.

Affirmed.

NEVILLE, P.J., and O'BRIEN, J., concur.