In the

# United States Court of Appeals

## For the Seventh Circuit

No. 19-1349

DIXON O'BRIEN, *et al.*,

*Plaintiffs-Appellants*,

*v.*

VILLAGE OF LINCOLNSHIRE,
a Municipal Corporation, *et al.*,

*Defendants-Appellees.*

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 1:18-cv-01310 — **John Robert Blakey**, *Judge.*

ARGUED SEPTEMBER 4, 2019 — DECIDED APRIL 7, 2020

Before ROVNER, SCUDDER, and ST. EVE, *Circuit Judges*.

ROVNER, *Circuit Judge.* Dixon O'Brien, John Cook, and the
unions to which they belong sued the Village of Lincolnshire
and the Illinois Municipal League claiming violations of their
rights under the First Amendment and the Equal Protection
Clause of the Fourteenth Amendment, as well as violations of

state law. The district court dismissed their federal claims under Federal Rule of Civil Procedure 12(b)(6) and declined to exercise supplemental jurisdiction over their remaining state law claims. We affirm.

**I.**

In reviewing a grant of a motion to dismiss, we are required to assume that the facts alleged in the complaint are true. *Savory v. Cannon*, 947 F.3d 409, 411–12 (7th Cir. 2020). At the time they filed their Complaint, both O'Brien and Cook were residents of Lincolnshire.[1] Both paid a variety of municipal taxes including property and sales taxes to the Village. O'Brien is a member of the International Union of Operating Engineers, Local 150, AFL-CIO. Cook is a member of Carpenters Local 250, an affiliate of the Chicago Regional Council of Carpenters, United Brotherhood of Carpenters and Joiners of America. We will refer to them collectively as the Unions. The Unions represent members who reside in, work in, and pay taxes to Lincolnshire.

Under Illinois law:

> The corporate authorities of each municipality may provide for joining the municipality in membership in the Illinois Municipal League, an unincorporated, nonprofit, nonpolitical associa-

---

[1] The operative complaint for the purposes of the appeal is the plaintiffs' Third Amended Complaint, which we will refer to as the "Complaint." R. 40. O'Brien later moved out of Lincolnshire and concedes that he no longer has standing for the purposes of injunctive relief, but continues to seek money damages.

> tion of Illinois cities, villages and incorporated towns and may provide for the payment of annual membership dues and fees. The member cities, villages and incorporated towns acting by, through and in the name of such instrumentality may provide and disseminate information and research services, and may do all other acts for the purpose of improving local government.

65 ILCS 5/1-8-1. Lincolnshire is one of more than a thousand dues-paying members of the Illinois Municipal League ("League" or "IML"). Lincolnshire uses tax revenue to pay those dues, specifically, money from the Village's General Fund. The General Fund, in turn, comes from utility, sales and income taxes, among other things. Over a five year period extending from 2013 to 2018, Lincolnshire paid at least $5,051 in voluntary dues and fees to the League.

Consistent with the statutory description of the League, the organization's Bylaws provide that the League:

> shall be an instrumentality of its member cities, villages and incorporated towns. Its purpose shall be to cooperate with its member municipalities in the development and improvement of their governments and to promote efficient municipal administration. The League shall furnish such service to municipalities as may be determined by the Board of Directors and through the Executive Director.

R. 40, Ex. A, at A-3.[2] According to the Bylaws, the Board of Directors is comprised of elected officers, each of whom must be the chief elected official in his or her respective municipality. The Board consists of a President, a First Vice President, a Second Vice President, thirty-six Vice Presidents, and any Past Presidents who are still the chief elected officials of their municipalities. The Executive Director is appointed by the Board of Directors, and manages the affairs of the League "under the general direction of the Board[.]" R. 40, Ex. A, at A-5, A-7. The Executive Director is expressly "responsible for League legislative and legal activities under the general supervision of the Board of Directors." R. 40, Ex. A, at A-8. Only municipalities, cities, villages and incorporated towns may join the League.

The plaintiffs allege that the League is a "private, nonpublic organization" that, contrary to the statutory description of the League as nonpolitical, engages in political activity including lobbying and contributing to candidates.[3] According to the

---

[2]  The plaintiffs attached the League's Bylaws to the Complaint, and refer to that document throughout the Complaint. We may therefore refer to the Bylaws in addressing the appeal of the district court's grant of the defendants' motion to dismiss. *Williamson v. Curran*, 714 F.3d 432, 436 (7th Cir. 2013). The plaintiffs also attached to the Complaint two advertisements from the League's website promoting the League's participation in Illinois' Lobby Day activities in 2017 and 2018, and we may consider those documents as well.

[3]  The plaintiffs cited to the Illinois State Board of Elections website in support of the allegation that the League contributed to political candidates. The defendants concede that, for some period of time, the League contrib-

(continued...)

plaintiffs, in March 2015, the League issued two emails to its members promoting the so-called "Turnaround Agenda" of then-Governor Bruce Rauner. The plaintiffs alleged that, on March 4, the League sent an email "lobbying Illinois units of government, urging them to adopt Illinois Governor Bruce Rauner's 'Turnaround Agenda[.]'" R. 40, at 4. On March 23, the League, "per Governor Rauner's request, emailed Illinois units of government a draft of 'Governor Rauner's Turnaround Agenda Resolution.'" R. 40, at 5.

> The March 23, 2015 IML email acknowledged ongoing correspondence between the IML and the Governor's office, stating, "[t]he Governor's office has asked that we follow-up with mayors and managers on the Turnaround Agenda information and provide a resolution … that is supportive of his administration's effort to address collective bargaining, unfunded mandates, prevailing wage requirements, workers' compensation costs and legal empowerment zones, among other things noted in the attachment … [i]f you do adopt it locally, please send me a copy electronically … and mail me a copy to the Governor's office …"

---

[3] (...continued)
uted to political candidates of both major parties in Illinois but, citing that same website on which the plaintiffs rely, note that the last such contribution was made in 2011, outside the two-year statute of limitations for a section 1983 claim based on those contributions. The plaintiffs have not disputed as a factual matter the timing of those payments or that they occurred outside the statute of limitations.

R. 40, at 5[4] (all punctuation as it appears in ¶ 32 of the Complaint). The plaintiffs also alleged that the League urged its members to adopt local ordinances creating "right to work" zones as part of the Turnaround Agenda. Lincolnshire was the only unit of local government in Illinois to adopt a "right to work" ordinance.[5]

The plaintiffs complain that, as tax-paying residents of Lincolnshire, some of their money goes to support the Village's payment of dues to the League, thereby subsidizing private speech with which the plaintiffs disagree. O'Brien demanded a refund of the portion of his tax money that went to fund Lincolnshire's dues in the League, a demand that has gone unanswered by the Village. Citing these allegations, the first count of the Complaint asserted that Lincolnshire violated the First Amendment rights of O'Brien and Cook by compelling them to support private speech with which they disagreed. The second count pled that Lincolnshire violated the First Amendment rights of O'Brien, Cook and the members of their respective Unions who reside in the Village by compelling

---

[4] The March 23 email was sent by the League's Executive Director. R. 68, at 4.

[5] We invalidated that ordinance in *International Union of Operating Engineers Local 399 v. Village of Lincolnshire*, 905 F.3d 995 (7th Cir. 2018). That decision was subsequently vacated by a grant of certiorari by the Supreme Court, which issued an order directing this court to remand the case to the district court with instructions to dismiss the case as moot. *See Village of Lincolnshire, Ill. v. International Union of Operating Engineers Local 399*, 139 S. Ct. 2692 (2019), and *International Union of Operating Engineers Local 399 v. Village of Lincolnshire*, 773 Fed. Appx. 314 (7th Cir. 2019).

them to associate with the League. The third count asserted that the Village violated the Equal Protection Clause of the Fourteenth Amendment by compelling all of the plaintiffs to support political activities with which they disagreed while allowing some unnamed others to refuse to do so. For each of these federal counts, the plaintiffs sought an injunction preventing the Village from using tax revenue to fund the League's private speech, a declaration that Lincolnshire's use of taxpayer money to pay dues to the League violates the federal rights of Cook and O'Brien, an order requiring Lincolnshire to refund to Cook and O'Brien the portion of their taxes used to fund the League, and other relief. The remaining counts pled state law causes of actions against the Village and the League which we need not address.

On the defendants' motion, the district court dismissed the federal claims and declined to exercise supplemental jurisdiction over the state law claims. The court rejected the defendants' assertion that the plaintiffs lacked standing to bring their claims, finding that they adequately alleged an injury-in-fact as municipal taxpayers. *See Hinrichs v. Speaker of House of Representatives of Indiana General Assembly*, 506 F.3d 584, 600 n.9 (7th Cir. 2007) (municipal taxpayer challenges to municipal action are not subject to the same stringent standing requirements as state and federal taxpayers seeking to challenge state and federal actions, respectively); *Clay v. Fort Wayne Community Schools*, 76 F.3d 873, 879 (7th Cir. 1996) (municipal taxpayers have standing when they object to a disbursement of funds occasioned solely by the alleged unconstitutional conduct). But the court concluded that the plaintiffs' First Amendment claims failed as a matter of law because the challenged

communications constituted government speech that is not subject to First Amendment scrutiny. The court also found that the Equal Protection claim failed as a matter of law because it depended on the validity of the First Amendment claims. The court dismissed the federal claims with prejudice and the state law claims without prejudice. The plaintiffs appeal.

## II.

On appeal, the plaintiffs contend that the district court erred in dismissing their First Amendment claims for violation of their speech and association rights as well as the Equal Protection claim because Lincolnshire compelled them to subsidize private speech on matters of substantial public concern. They also contend that the district court abused its discretion in dismissing the Complaint with prejudice. Finally, they contend that the district court abused its discretion by denying their post-judgment Rule 59(e) motion to convert the dismissal to one without prejudice in order to allow them to file a fourth amended complaint against Lincolnshire and the League.

## A.

We review *de novo* the district court's decision to dismiss claims pursuant to Rule 12(b)(6), accepting as true all well-pleaded facts and drawing all reasonable inferences in favor of the non-moving party. *Tobey v. Chibucos*, 890 F.3d 634, 645 (7th Cir. 2018); *Ball v. City of Indianapolis*, 760 F.3d 636, 642–43 (7th Cir. 2014). In addition to the allegations set forth in the Complaint itself, we may consider "documents that are attached to the complaint, documents that are central to the complaint and are referred to in it, and information that is

properly subject to judicial notice." *Williamson*, 714 F.3d at 436. "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

In the first two federal counts of the Complaint, the plaintiffs alleged that the Village violated their First Amendment rights by using their tax dollars to join the League, thereby compelling them to subsidize the private speech of the League and to associate with the League. In each instance, they emphasized that the League is a private organization that issued private speech with which they disagree. As we detailed above, the objectionable speech consisted of emails from the League to its own members purportedly encouraging them to adopt then-Governor Rauner's "Turnaround Agenda." The plaintiffs rely heavily on *Janus v. American Federation of State, County, and Municipal Employees, Council 31*, 138 S. Ct. 2448 (2018), and other cases addressing compelled or subsidized speech for the proposition that the government may not force a citizen to subsidize private speech with which the citizen disagrees. But *Janus* and the cases prohibiting the government from compelling subsidies in support of *private* speech are a poor fit for the federal counts alleged by the plaintiffs.

In *Janus*, the Supreme Court considered an Illinois law that forced public employees to subsidize a union, even if they chose not to join the union and strongly objected to the positions that the union took in collective bargaining. 138 S. Ct. at 2459–60. The Court concluded that the arrangement "violates the free speech rights of nonmembers by compelling

them to subsidize private speech on matters of substantial public concern." *Id*. The Court noted that the First Amendment protects both the right to speak freely and the right to refrain from speaking. *Janus*, 138 S. Ct. at 2463. Likewise, the freedom to associate encompasses the freedom not to associate. *Id*. Although most free speech cases involve restrictions on what could be said, "measures compelling speech are at least as threatening." *Janus*, 138 S.Ct. at 2464. Moreover, "[c]ompelling a person to *subsidize* the speech of other private speakers raises similar First Amendment concerns." *Janus*, 138 S. Ct. at 2464 (emphasis in original). The Court ultimately concluded that none of the interests set forth for compelling non-consenting employees to subsidize the union could outweigh the First Amendment rights of those employees. As is apparent from this review of *Janus*, the plaintiff there was forced to subsidize a *private speaker*, namely, the union, whose speech was controlled by that private speaker and not by the government. *Janus* did not address the difference between private speech and government speech. It simply was not an issue in the case.

The plaintiffs relied on *Janus* to contend that they were wrongfully compelled to support, through mandatory taxes paid to Lincolnshire, the speech of the League, which they characterized on appeal as a "private, third-party entity that engaged in lobbying efforts that were initiated by other third parties." Brief of Appellants, at 17–18. They also cited *Johanns v. Livestock Marketing Association*, 544 U.S. 550 (2005), and other cases in arguing that the "government can violate the First Amendment when it compels individuals to subsidize the speech of a private party." Brief of Appellants at 17. *Johanns* is relevant to determining the outcome here, but not in the

manner that the plaintiffs urge. Rather, *Johanns* demonstrates that the speech at issue in the Complaint is not private speech but rather is government speech that is not subject to First Amendment scrutiny.

In *Johanns*, the Court considered a First Amendment challenge to the Beef Promotion and Research Act ("Beef Act"), as implemented by the Secretary of Agriculture ("Secretary") through a Beef Promotion and Research Order ("Beef Order"). The Beef Act announced a federal policy of promoting the marketing and consumption of beef, using funds raised by an assessment on cattle sales and importation. The statute directed the Secretary to implement the Beef Order by appointing a Beef Board consisting of beef producers and importers, and imposing a $1 per head assessment on all sales or importation of cattle. The Beef Board, in turn, created an Operating Committee consisting of ten Beef Board members and ten representatives named by a federation of state beef councils. Although only half of the members of the Operating Committee were appointed by the Secretary, all were subject to removal by the Secretary. The Operating Committee was charged with designing promotional campaigns for beef products, subject to the approval of the Secretary. *Johanns*, 544 U.S. at 553–54.

More than a billion dollars was collected through the assessment and a large portion went to advertising promotions such as the "Beef. It's What's for Dinner." campaign. Associations of beef producers who were required to pay the assessment sued the Secretary, objecting on First Amendment grounds to the compelled subsidy of speech with which they

did not agree.[6] The Court noted that "[i]n all of the cases invalidating exactions to subsidize speech, the speech was, or was presumed to be, that of an entity other than the government itself." *Johanns*, 544 U.S. at 559. And each of those compelled subsidy cases respected the principle that compelled support of a *private* association is fundamentally different from compelled support of *government*. *Johanns*, 544 U.S. at 559 (citing *Abood v. Detroit Board of Education*, 431 U.S. 209, 259 n.13 (1977)). But:

> "Compelled support of government"—even those programs of government one does not approve—is of course perfectly constitutional, as every taxpayer must attest. And some government programs involve, or entirely consist of, advocating a position. "The government, as a general rule, may support valid programs and policies by taxes or other exactions binding on protesting parties. Within this broader principle it seems inevitable that funds raised by the government will be spent for speech and other expression to advocate and defend its own policies."

*Johanns*, 544 U.S. at 559 (quoting *Board of Regents of University of Wisconsin System v. Southworth*, 529 U.S. 217, 229 (2000)). Prior to *Johanns*, the Court had assumed, though not yet held,

---

[6] Apparently, the beef producers objected to the promotion of beef as a generic commodity, which they contended impeded their ability to promote the superiority of particular kinds of beef, such as American beef, grain-fed beef, or certified Angus or Hereford beef. *Johanns*, 544 U.S. at 556.

that compelled funding of government speech does not raise First Amendment concerns. *Johanns*, 544 U.S. at 559. The issue was thus whether the beef promotion advertising was government speech.

The plaintiffs asserted that, because the content of the speech was effectively controlled by a nongovernmental entity—the Operating Committee—the advertisements could not be considered government speech. The Court rejected the premise of the argument and declined to consider whether the Operating Committee was "governmental" or "nongovernmental." 544 U.S. at 560 n.4. Instead, the Court concluded that the message of the promotional campaigns was effectively controlled by the government itself. Congress and the Secretary "set out the overarching message and some of its elements, and they have left the development of the remaining details to an entity whose members are answerable to the Secretary (and in some cases appointed by him as well)." 544 U.S. at 561. Moreover, the Secretary exercised final approval authority over the wording of the promotional campaign. All of the messages were reviewed by government officials both for substance and wording, and some were rewritten or rejected. Government officials also attended and participated in the meetings where proposals were developed. Further:

> [w]hen, as here, the government sets the overall message to be communicated and approves every word that is disseminated, it is not precluded from relying on the government-speech doctrine merely because it solicits assistance from nongovernmental sources in developing specific messages.

*Johanns*, 544 U.S. at 562.

The Court also rejected a contention that the beef program did not qualify as government speech because it was funded by a targeted assessment rather than by general revenues, which, the plaintiffs argued, had the dual effect of giving control not to politically accountable legislators but to a narrow interest group, and also creating a perception that the advertisements speak for all beef producers.

> Citizens may challenge compelled support of private speech, but have no First Amendment right not to fund government speech. And that is no less true when the funding is achieved through targeted assessments devoted exclusively to the program to which the assessed citizens object.

*Johanns*, 544 U.S. at 562. It was enough that a federal statute authorized the program and prescribed the basic message,

> and specific requirements for the promotions' content are imposed by federal regulations promulgated after notice and comment. The Secretary of Agriculture, a politically accountable official, oversees the program, appoints and dismisses the key personnel, and retains absolute veto power over the advertisements' content, right down to the wording. And Congress, of course, retains oversight authority, not to mention the ability to reform the program at any time. No more is required.

*Johanns*, 544 U.S. at 563–64.

Following *Johanns*, the Court reiterated that the First Amendment does not regulate government speech. *See e.g., Walker v. Texas Division, Sons of Confederate Veterans, Inc.*, 135 S. Ct. 2239, 2245 (2015); *Pleasant Grove City, Utah v. Summum*, 555 U.S. 460, 467 (2009). "A government entity has the right to 'speak for itself.'" *Pleasant Grove,* 555 U.S. at 467 (quoting *Southworth*, 529 U.S. at 229). A government may say what it wishes and select the viewpoints that it wants to express. *Pleasant Grove*, 555 U.S. at 467–68. *See also Walker*, 135 S.Ct. at 2245 (when the government speaks, it is not barred by the First Amendment from determining the content of what it says).

> Indeed, it is not easy to imagine how government could function if it lacked this freedom. If every citizen were to have a right to insist that no one paid by public funds express a view with which he disagreed, debate over issues of great concern to the public would be limited to those in the private sector, and the process of government as we know it radically transformed.

*Pleasant Grove*, 555 U.S. at 468 (internal quotation marks and citations omitted). *See also Walker*, 135 S. Ct. at 2246 (noting that a city government must have the freedom to choose its message in order to promote its preferred programs such as recycling). Echoing *Johanns*, the Court said that a "government entity may exercise this same freedom to express its views when it receives assistance from private sources for the purpose of delivering a government-controlled message." *Pleasant Grove*, 555 U.S. at 468. Government speech is not

limitless; it must comport, for example, with the Establishment Clause. And it is subject to the check of political process, where objecting citizens may hold public officials to account through the ballot box. *Pleasant Grove*, 555 U.S. at 468–69. "But, as a general matter, when the government speaks it is entitled to promote a program, to espouse a policy, or to take a position. In doing so, it represents its citizens and it carries out its duties on their behalf." *Walker*, 135 S. Ct. at 2246.

With these principles in mind, we turn to the salient facts alleged in the Complaint as supplemented by the documents that are attached to the complaint. Lincolnshire is the only defendant named in the three federal counts, and relief is sought from Lincolnshire alone. The only bad act alleged is the Village's statutorily authorized voluntary use of taxpayer funds to join the League, a purportedly private organization, which in turn issued the speech that offended the plaintiffs. The central question is whether, in joining the League, the Village has compelled the plaintiffs to subsidize private speech or that of the government itself.[7]

---

[7] Although the Complaint alleged that the offending speech came in the form of emails issued by the League itself, in briefing on appeal, the plaintiffs added that other, private third parties controlled the message. During oral argument, the plaintiffs identified the private third parties as the League's Executive Director who sent the emails, then-Governor Rauner and an outside consultant. None of this purportedly third-party control of the League's speech was alleged in the Complaint. As the district court found, the Complaint alleged no private control over the message. The Complaint instead asserted only that the League is a private organization, which is not a decisive factor under *Johanns* as we discuss *infra*.

According to the Complaint, the Bylaws attached to the Complaint, and Illinois law, the League itself is an unincorporated association whose membership is composed entirely of cities, villages and incorporated towns of Illinois.[8] In other words, it is composed entirely of local governments. Its Bylaws establish that it is run by a Board of Directors that consists entirely of the highest elected officials of member governments. Illinois law provides that local governments may join the League if they wish and pay the applicable dues and fees, and so it is a voluntary association. 65 ILCS 5/1-8-1. That same statute provides that the "member cities, villages and incorporated towns *acting by, through and in the name of such instrumentality* may provide and disseminate information and research services, and may do all other acts for the purpose of improving local government." As a member, Lincolnshire thus acts by and through the League in issuing messages for the purpose of

---

[8] Illinois law provides that a "voluntary unincorporated association may sue and be sued in its own name, and may complain and defend in all actions. For the purposes of this Code, 'voluntary unincorporated association' means any organization of 2 or more individuals formed for a common purpose, excluding a partnership or corporation." 735 ILCS 5/2-209.1. Illinois case law indicates that the bylaws of a voluntary association create a contract between the association and its members. *Lo v. Provena Covenant Medical Center*, 826 N.E.2d 592, 598 (Ill. App. 2005). That same case, citing Black's Law Dictionary, likened a voluntary association to an unincorporated business organization that is not a legal entity separate from the persons who compose it. *Id*. *See also Pecoraro v. Balkonis*, 891 N.E.2d 484, 492 (Ill. App. 2008) (noting that "nonprofit association" means an unincorporated organization consisting of two or more members by mutual consent for a common, nonprofit purpose, and concluding that individual members may not be held liable in tort for acts of the association unless they participated in or ratified the actions that caused injury).

improving local government. The decision to join – to associate with – the League is controlled entirely by the Village, and membership both allows Village control over the League's messages and signals a willingness to speak through the League. Under *Johanns*, *Walker*, and *Pleasant Grove*, plaintiffs' taxpayer funds thus supported Lincolnshire's action and Lincolnshire's speech.

Although the parties dispute whether the League may be characterized as a private or governmental organization, such a designation is not determinative of whether the plaintiffs have been compelled to subsidize private speech.[9] *Johanns*, 544 U.S. at 560 & n.4 (declining to consider whether the Operating Committee was "governmental" or "nongovernmental" and instead turning to whether the message of the promotional campaigns was effectively controlled by the government itself). Based on the plaintiffs' own allegations, the conduct of joining the League and the message at issue here are ultimately controlled by the government of Lincolnshire itself and also by the League's other governmental members. That the Village

---

[9] In its answer to an earlier version of the complaint, Lincolnshire admitted that the League is a private organization. Although it subsequently sought to distance itself from that admission by contending without authority that its admission was somehow superceded by the filing of a subsequent complaint, the Village never withdrew its concession in the district court. Lincolnshire's admission is not binding on the League, which made no similar admission and characterizes itself as a "quasi-governmental" association. We need not decide whether the League is private, governmental, or "quasi-governmental" because the determinative factor is not the nature of the League but whether the government ultimately controlled the speech.

and other municipal members used the League (or any third party) to craft a particular message does not deprive the speech of its government ownership. *See Johanns*, 544 U.S. at 562; *Pleasant Grove*, 555 U.S. at 468. By the plaintiffs' own allegations, both the statute authorizing membership and the Bylaws provide that the League is an instrumentality of local governments which may act through the League to disseminate information and engage in acts to improve local government. 65 ILCS 5/1-8-1; Bylaws, R. 40-1, at 2.

Lincolnshire itself, which the plaintiffs agree (as they must) has the right to speak for itself and also a right to associate, voluntarily joined the League as it is authorized to do by statute. As a member, Lincolnshire could adopt the speech of the League if it wished or could denounce the speech or leave the League at any time if it disagreed with the message issued. But as the plaintiffs pled, Lincolnshire was unique in Illinois in its whole-hearted adoption of the League's promotion of the Governor's Turnaround Agenda. It was the only unit of local government to adopt an ordinance legalizing local "right to work zones," as promoted in the Turnaround Agenda. Although the plaintiffs vehemently disagree with the Turnaround Agenda, they cannot plausibly claim that Lincolnshire—by itself or through an association of local governments—lacked the right to speak and to take a position on that Agenda.

Indeed, the plaintiffs conceded at oral argument that if the League had acted as described in the statute, the speech at issue would properly be characterized as government speech that is not subject to First Amendment scrutiny. The problem, they assert, is that the League exceeded the scope of its

authority by engaging in "political" lobbying activity when the statute described the League as a "nonpolitical" association, and also that the League did not operate according to its Bylaws but was instead subject to the outside influence of private third parties. Although the plaintiffs did not allege this interference in the Complaint, they now assert that, contrary to the Bylaws, the Board did not control the Executive Director, and that the Executive Director was acting in concert with the Governor and an outside consultant in lobbying members to adopt the Governor's agenda.

It is true that the statute describes the League as "nonpolitical," but the entire purpose of the League is to act as an instrumentality of its governmental members in order to "provide and disseminate information and research services, and … do all other acts for the purpose of improving local government," all of which can be described as political acts in the sense that they are related to government and governing.[10] *See* Concise Oxford English Dictionary, Oxford University Press, Eleventh Edition (2004) (defining "political" as "relating to the government or public affairs of a country"). It is difficult to see how the League could accomplish its purpose as described by statute unless it could lobby its own members and the state legislature on issues related to improving local government. To adopt the plaintiffs' definition of the word

---

[10] In context, the word "nonpolitical" likely means nonpartisan, a definition that would be consistent with and give effect to the other provisions of the statute. Nonprofit organizations such as the League may not engage in partisan activities. 26 U.S.C. § 501(c)(3). We emphasize again that, to the extent the League engaged in partisan donations to candidates, it indisputably did so outside the statute of limitations.

"nonpolitical" would render the remainder of the Illinois statute nonsensical and inert. As the Supreme Court held, "when the government speaks it is entitled to promote a program, to espouse a policy, or to take a position. In doing so, it represents its citizens and it carries out its duties on their behalf." *Walker*, 135 S. Ct. at 2246. The government is entitled to select the viewpoints that it wants to express. *Pleasant Grove*, 555 U.S. at 467–68. The same is no less true when a municipality voluntarily joins an association of local governments, which were doing nothing more than speaking among themselves and taking actions that local governments have a right to take. As the Supreme Court also noted, it is difficult to see how local governments could operate unless they were allowed to discuss, either directly or through a surrogate, ideas related to municipal government, regardless of where those ideas originated.

As for the new allegations that the Board did not actually control the message but allowed the Executive Director to craft the message with the influence of third parties, the plaintiffs do not dispute that, had the Executive Director engaged in rogue actions beyond his authority or with which the Board disagreed, the Board was entitled to remove him, and all members were within their rights to denounce the message and withdraw from the voluntary association.[11] Lincolnshire did not denounce the message or terminate its membership in the

---

[11] Under the Bylaws of the League, the Executive Director is responsible for legislative and legal activities under the supervision of the Board of Directors. The Executive Director's actions are subject to the control of the Board, which may remove the Executive Director at any time.

League; according to the plaintiffs' own allegations, it was the one unit of local government in Illinois that endorsed the offending message fully. In essence, as alleged in the Complaint, Lincolnshire adopted the message, as it is entitled to do. Any input from the Executive Director, the Governor or any other third party could not change the nature of the speech because Lincolnshire retained ultimate control over the message itself. *Pleasant Grove*, 555 U.S. at 468 (a "government entity may exercise this same freedom to express its views when it receives assistance from private sources for the purpose of delivering a government-controlled message.").

In short, the facts alleged here bear no resemblance to *Janus*, where the plaintiffs alleged that they were compelled to support *private* speech issued by unions and not controlled by the government. The plaintiffs here pled themselves out of court when they alleged that Lincolnshire did nothing more than join the League, a voluntary association of local governments, an act it has every right to do, and that the League issued speech to its own members, under Bylaws that expressly gave the League's governmental members ultimate control over the association's message. The plaintiffs failed to allege private *control* of the speech; they instead pled facts that conclusively demonstrated that the conduct and messages at issue were governmental speech and association not subject to First Amendment scrutiny.

The viability of the plaintiffs' Equal Protection claim depends on the validity of the First Amendment claims. Because Lincolnshire did not violate the plaintiffs' rights under the First Amendment, the Equal Protection claim fails as well.

And the district court did not abuse its discretion by declining to exercise supplemental jurisdiction over the state law claims.

**B.**

The plaintiffs next argue that the court erred by dismissing the federal claims with prejudice, and by denying their Rule 59(e) motion to reconsider in order to allow them to seek leave to file a Fourth Amended Complaint. In particular, the plaintiffs contend that they should have been allowed an opportunity to amend because the Complaint that the court dismissed was the first one to include the League as a defendant. We review a district court's denial of a Rule 59(e) motion for reconsideration and denial of a motion for leave to amend for abuse of discretion. *NewSpin Sports, LLC v. Arrow Electronics, Inc.*, 910 F.3d 293, 300 (7th Cir. 2018). Ordinarily, after an original complaint is dismissed under Rule 12(b)(6), a court should allow at least one opportunity to amend the complaint before dismissing the entire action. *NewSpin Sports*, 910 F.3d at 310; *Runnion ex rel. Runnion v. Girl Scouts of Greater Chicago. & Northwest Ind.*, 786 F.3d 510, 519 (7th Cir. 2015). On a plaintiff's request to amend, the court should "freely give leave when justice so requires." Fed. R. Civ. P. 15(a)(2).

> In the absence of any apparent or declared reason—such as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc.—the leave sought should, as the rules require, be

'freely given.' Of course, the grant or denial of an opportunity to amend is within the discretion of the District Court, but outright refusal to grant the leave without any justifying reason appearing for the denial is not an exercise of discretion; it is merely abuse of that discretion and inconsistent with the spirit of the Federal Rules.

*Foman v. Davis*, 371 U.S. 178, 182 (1962).

However, once a district court has entered final judgment dismissing a case, the plaintiff may not amend under Rule 15(a) unless the judgment is modified, either by the district court under Rule 59(e) or 60(b), or on appeal. *NewSpin Sports*, 910 F.3d at 310; *Runnion*, 786 F.3d at 521. Although Rules 59(e) and 60(b) provide extraordinary remedies for exceptional circumstances, we review post-judgment motions for leave to amend according to the Rule 15 standard when a district court enters judgment at the same time it first dismisses a case. *NewSpin Sports*, 910 F.3d at 310; *Runnion*, 786 F.3d at 521; *Gonzalez- Koeneke v. West*, 791 F.3d 801, 808 (7th Cir. 2015). Thus, when the "district court has taken the unusual step of entering judgment at the same time it dismisses the complaint, the court need not find other extraordinary circumstances and must still apply the liberal standard for amending pleadings under Rule 15(a)(2)." *Runnion*, 786 F.3d at 521.

In this case, the district court used the higher standard of Rule 59(e) when deciding the motions to alter or amend the judgment and for leave to amend the complaint. The court should have applied the more generous Rule 15(a) standard

but it is apparent from the court's order and from the record that, ultimately, the court did not abuse its discretion. A review of the history of the proceedings makes this clear.

O'Brien and his union filed the first complaint against Lincolnshire on February 21, 2018, raising the same federal claims that are at issue here. A week later, prior to the filing of an answer, O'Brien and his union filed an amended complaint containing additional factual allegations and further explanation of the legal basis of the constitutional claims. In March 2018, Lincolnshire answered the amended complaint, and in May, the plaintiffs moved for leave to file a second amended complaint in order to add Cook and his union as plaintiffs. The court granted that motion, and two weeks later, on May 21, 2018, Lincolnshire moved to dismiss the second amended complaint. In that motion, the Village challenged the plaintiffs' standing and also argued that the payment of dues to the League and the adoption of the League's speech constituted government speech and association that was not subject to First Amendment review.

The day after Lincolnshire filed its motion to dismiss, the district court advised the plaintiffs to review the court's Standing Order regarding motions to dismiss, and elect either to amend their most recent complaint or proceed with briefing on the motion to dismiss:

> When a motion to dismiss is filed, the non-moving party has a right to amend its pleading once within 21 days. Fed. R. Civ. P. 15(a)(1)(B). If the non-moving party elects not to amend its pleading to address the purported

deficiencies raised by the motion (or seek leave to amend its pleading again), then the motion to dismiss will proceed in its normal course and, if the moving party prevails, the Court may dismiss the case with prejudice and not provide further opportunity to amend the pleading absent extraordinary circumstances. If the non-moving party amends its pleading, then the moving party (unless ordered otherwise by the Court) shall file within 21 days of the amended pleading either: (1) an answer or (2) a new motion to dismiss.

Standing Order of Judge John Robert Blakey, https://www.ilnd.uscourts.gov/judge-info.aspx?RxIItJ+3ldN9 9GnKt+Q4wg== (last visited March 19, 2020). Part of this Standing Order was problematic. "A district court does not have the discretion to remove the liberal amendment standard by standing order or other mechanisms requiring plaintiffs to propose amendments before the court rules on a Rule 12(b)(6) motion on pain of forfeiture of the right to amend." *Runnion*, 786 F.3d at 523 n.3. But the Standing Order helpfully alerted the plaintiffs of their right to amend under Rule 15.

The plaintiffs elected to amend and filed their Third Amended Complaint (the Complaint at issue in this appeal) on June 19, 2018. The Complaint contained new factual allegations related to standing, and added two state law counts. One of those new counts was filed against the League, the first time the League was named as a defendant in the case. On August 3, the defendants moved jointly to dismiss the Complaint. In that motion, they argued that the plaintiffs lacked standing to

bring the First Amendment claims. They also again contended that the First Amendment does not regulate the Village's speech through the League or its association with the League. Citing *Johanns*, *Pleasant Grove* and other cases, they argued that the speech at issue was the Village's own government speech. They noted Lincolnshire's right to voluntarily associate with the League and to adopt particular viewpoints with which some citizens might disagree. They urged the court to reject any argument that the League was a private organization, noting that it was an association that consisted entirely of local governments, and that the association was not a legal entity separate from its members. But they also urged the court not to assign conclusive importance to the claim that the League was a private organization because Lincolnshire had voluntarily joined the association knowing the League's purpose, mission and message, and could leave it any time. Its choice to be a member was thus an exercise of Lincolnshire's own First Amendment expressive association rights regardless of the private character of any group it joined. Arguing that the Supreme Court had at least thrice found that speech designed by private parties was government speech under analogous circumstances, the defendants contended that the Village's voluntary membership in the League was itself government speech that was not subject to First Amendment scrutiny. R. 51, Memorandum in Support of Joint Motion to Dismiss, at 9–10. *See also Pleasant Grove*, 555 U.S. at 481; *Johanns*, 544 U.S. at 562; and *Walker*, 135 S. Ct. at 2251. The defendants maintained that the Equal Protection claim failed for multiple reasons, including because it was tied to the legitimacy of the First Amend-

ment claims. Finally, the defendants asked the court to decline to exercise supplemental jurisdiction over the state law claims.

The plaintiffs did not seek leave to amend the Complaint again but instead responded to the motion to dismiss. In that response, the plaintiffs asked only that the court deny the motion; they did not request in the alternative for leave to amend the Complaint. The court heard oral argument on the motion to dismiss on September 13 and took the motion under advisement. At the same time, discovery proceeded and the plaintiffs gathered additional information about the League through documents and depositions, including the deposition of the League's Executive Director. Discovery was set to close on December 5, 2018. On November 29, the court held a hearing related to discovery issues. At that hearing, "Plaintiffs' counsel admitted that nothing in the discovery would change how they drafted the [Complaint], and thus it would fall or stand on its allegations at that time." R. 93, at 6–7 (Memorandum Opinion and Order, Jan. 24, 2019). On December 7, 2018, the court granted the defendants' motion to dismiss the Complaint with prejudice and declined to exercise supplemental jurisdiction over the state law claims. The plaintiffs then filed a Rule 59(e) motion seeking to convert the dismissal to one without prejudice based upon newly discovered evidence. In the motion, the plaintiffs indicated their intention to request leave to file a fourth amended complaint if the court granted the Rule 59(e) motion. They also sought clarification that the state law counts had been dismissed without prejudice.

In its ruling on those motions, the district court clarified that the state law claims were dismissed without prejudice. Although the court erroneously applied the Rule 59(e) stan-

dard to both the motion to alter or amend the judgment and the motion for leave to amend the Complaint, the reasoning demonstrates that the court did not abuse its discretion in denying the motions. The court found that the so-called newly discovered evidence had in fact been in the plaintiffs' possession for more than three weeks before the court ruled on the motion to dismiss. Importantly, the plaintiffs possessed all of this information before counsel assured the court that nothing in the discovery would cause them to amend the Complaint and that the plaintiffs' claims would fall or stand on the allegations at that time. Although the plaintiffs now dispute the court's characterization of what counsel said at the November 29 hearing, the plaintiffs have failed to place the transcript of that hearing in the record. *See* Fed. R. App. P. 10(b)(2) ("If the appellant intends to urge on appeal that a finding or conclusion is unsupported by the evidence or is contrary to the evidence, the appellant must include in the record a transcript of all evidence relevant to that finding or conclusion."). We therefore have no reason to question the court's characterization of that hearing. We take the court at its word that the plaintiffs expressed an intention for their Complaint to fall or stand on the allegations as drafted. *Dupree v. Hardy*, 859 F.3d 458, 463 (7th Cir. 2017) (noting that we cannot meaningfully review a decision where the appellant has not provided a transcript of the hearing in which the court explained its reasons for denying the motion); *Morisch v. United States*, 653 F.3d 522, 529 (7th Cir. 2011) (a violation of Rule 10(b)(2) is grounds for forfeiture and dismissal). The court also rejected as irrelevant the plaintiffs' assertion that they intended to file a motion for summary judgment before the court's deadline for

dispositive motions (December 14, 2018) rather than seeking leave to amend the Complaint. The court found that this was a procedural failing based on a strategic choice that could not justify the grant of a Rule 59(e) motion.

In discussing the new evidence and allegations that the plaintiffs wished to add to a fourth amended complaint, the court repeatedly noted that the plaintiffs had not explained how any of this evidence was relevant to the government speech doctrine. Although the court did not use the word "futile" in describing the proposed additions to the Complaint, it is clear that the court found that none of the new allegations would alter the outcome of its ruling on the motion to dismiss because none of the new evidence affected the government speech analysis. In other words, the proposed amendments would be futile.

The Complaint that the court dismissed was the fourth complaint that the plaintiffs lodged against Lincolnshire, but the first complaint filed against the League. But the only count against the League was a state law claim that the court dismissed *without* prejudice, declining to exercise supplemental jurisdiction over both state law claims. As is apparent from this record, this is not an instance where a plaintiff lacked an opportunity to amend. The plaintiffs had already been granted leave to amend the federal counts asserted against Lincolnshire (the only counts dismissed with prejudice here) after the first motion to dismiss. The second motion to dismiss largely echoed the first, and so the plaintiffs were fully aware of the import of the government speech doctrine when they filed the Third Amended Complaint, the one at issue in this appeal. None of the amendments in the proposed Fourth Amended

Complaint would cure the defects that led to dismissal of the Third Amended Complaint. Moreover, when the defendants filed their September 3 joint motion to dismiss, the plaintiffs asked the court only to deny the motion, and did not request in the alternative for leave to amend the Complaint again. They also assured the court at the November 29 discovery hearing that they had no intention of seeking leave to amend based on any of the evidence they uncovered in discovery. Although they now assert that the defendants raised new issues that they did not anticipate regarding the public nature of the League and the League's own right to issue its own government speech, all of this was apparent by November 29, and none of it could change the outcome of the motion to dismiss. In this context, we conclude that the district court did not abuse its discretion in dismissing the federal counts with prejudice, and denying both the Rule 59(e) motion and the motion for leave to amend the Complaint.

AFFIRMED.