In the

# United States Court of Appeals

## For the Seventh Circuit

———————

No. 25-1405

JULIUS H. SCHOEPS, *et al.*,

*Plaintiffs-Appellants*,

*v.*

SOMPO HOLDINGS, INC., *et al.*,

*Defendants-Appellees*.

———————

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 1:22-cv-07013 — **Jeremy C. Daniel**, *Judge*.

———————

ARGUED SEPTEMBER 18, 2025 — DECIDED NOVEMBER 21, 2025

———————

Before RIPPLE, LEE, and PRYOR, *Circuit Judges*.

RIPPLE, *Circuit Judge*. Julius Schoeps, Florence von Kes-
selstatt, and Britt-Marie Enhoerning,[1] acting as the heirs of

---

[1] Mr. Schoeps is a German citizen residing in Berlin, Germany. Ms. En-
hoerning is a dual citizen of the United States and Sweden, residing in
Sweden. Ms. Kesselstatt is a resident of Munich, Germany. Ms. Kes-
selstatt's citizenship is not specified in the complaint. The plaintiffs do not
invoke the jurisdiction of the district court on the ground of diversity.

Paul von Mendelssohn-Bartholdy, a German art collector who was persecuted by the Nazi government, brought this action against Sompo Holdings, Inc. ("Sompo Holdings"), Sompo International Holdings Ltd. ("Sompo International"), Sompo Japan Insurance, Inc. ("Sompo Japan"), and Sompo Fine Art Foundation ("Sompo Foundation").[2] They seek to recover *Sunflowers*, a painting by Vincent van Gogh. According to the allegations of the complaint, the defendants wrongfully converted the painting and exploited it for financial gain.

For the reasons set forth in this opinion, we affirm the judgment of the district court.

---

[2] Sompo Japan is incorporated in Japan. Its headquarters and principal place of business are also in Japan, although it has subsidiaries throughout the world. The other three defendants are affiliates of Sompo Japan. Sompo International is incorporated in Bermuda and has its principal place of business in Bermuda. Sompo International was established in 2017. Sompo Foundation is incorporated in Japan and has its principal place of business in Japan. Sompo Foundation was established in 1976 as a public interest corporation. Its activities include collecting and preserving art for display in the Sompo Museum of Art in Tokyo, where *Sunflowers* is currently on permanent display. Sompo Holdings is incorporated in Japan and has its principal place of business in Tokyo. It is the parent company of Sompo Japan, Sompo International, and Sompo Foundation. Sompo Holdings was established in 2010. The Sompo family of companies (except for Sompo Foundation) engages in the sale of property and casualty insurance. In conducting their business, the Sompo companies coordinate with each other to some degree.

# I

# BACKGROUND

## A. Facts

This appeal comes to us from the district court's grant of a motion to dismiss under Rules 12(b)(1) and 12(b)(2) of the Federal Rules of Civil Procedure. We therefore take as true the allegations of the complaint and base this present recitation on those allegations. However, we also may rely on each party's written declarations, resolving all factual disputes in the plaintiffs' favor. *B.D. ex rel. Myers v. Samsung SDI Co.*, 143 F.4th 757, 763 (7th Cir. 2025).

Vincent van Gogh painted *Sunflowers* in 1888. Paul von Mendelssohn-Bartholdy, a German banker and art collector, later acquired the painting. Mendelssohn-Bartholdy was the co-owner and director of an international bank, Mendelssohn & Co., which was one of the five largest private banks in Germany. He also was a prominent member of the finance industry and held a seat on the board of the Berlin Stock Exchange.

When the Nazi Party came to power, it targeted Mendelssohn-Bartholdy for persecution because he was Jewish. Throughout the 1930s, he suffered increasingly severe sanctions that ultimately eroded his livelihood. In 1934, he was removed from participation in the Reich Insurance Corporation and the Central Union of German Banking and Bankers. He also was removed from the board of the Berlin Stock Exchange. Mendelssohn & Co. was transferred forcibly to non-Jewish ownership.

Finding himself in an untenable financial situation, Mendelssohn-Bartholdy had to liquidate his art collection. In 1934, he placed *Sunflowers* on consignment with Paul Rosenberg, a

Parisian art dealer. Rosenberg sold *Sunflowers* to Edith Beatty, a British-American heiress. *Sunflowers* was sold again in 1987 at Christie's auction house in London. It was purchased for $40 million by Yasuda Fire and Marine Insurance Company ("Yasuda"), the predecessor-in-interest of defendant Sompo Japan. Yasuda kept *Sunflowers* in Japan until 2001. It then loaned the painting to the Art Institute of Chicago for temporary exhibition. That exhibition—titled "Van Gogh and Gauguin: The Studio of the South"—lasted approximately four months, from September 2001 to January 2002. Following the Chicago exhibition, the Van Gogh Museum in Amsterdam displayed *Sunflowers* for approximately four months. As part of its loan agreements with the Art Institute of Chicago and the Van Gogh Museum, Yasuda received reciprocal promises from both to lend Van Gogh paintings to an exhibition in Tokyo in 2003.

While coordinating the exhibition in Chicago, a representative of Yasuda emailed a representative of the Art Institute of Chicago, stating concerns about the provenance of *Sunflowers* and the possibility that it was Nazi-looted art.[3]

---

[3] In an email to both the Art Institute of Chicago and the Van Gogh Museum, a Yasuda representative stated: "In regard to the ownership issue, we can not [sic] change the ownership during this loan period under no circumstances even Nazis [sic] confiscation problem may arise in America and in Holland. We would like to include the clear terms in the loan agreement to protect our paintings against this problem." R.39-1. In another email, they wrote "[w]e are deeply concerned about our Gogh' and Gauguin' provenance. We think our two works have nothing to do with Nati-looted [sic] art, but we are not 100% sure. Could you advise us with your suggestion on this issue?" R.39-16.

They concluded that the provenance was "clear."[4] *Sunflowers* returned to Japan in 2002, where it has remained.

In 2002, following a merger, Yasuda changed its name to Sompo Japan Insurance, Inc. Sompo Japan remains the owner of *Sunflowers* to this day.

Sompo International's website states that "Sompo International is backed by the financial strength of Sompo Holdings, Inc., which holds more than $100 billion in total assets."[5] Sompo Holdings and Sompo International have interlocking office space in Tokyo and at least four individuals hold executive positions in both companies. Additionally, Sompo Holdings has encouraged its stakeholders and clientele to view the Sompo family of companies as "One Sompo." The corporate family has a large global footprint, including approximately 80,000 employees in 228 cities across thirty countries.

Sompo Holdings and Sompo International each maintain separate websites that are accessible internationally, including in Illinois. The Sompo Holdings website contains an image of *Sunflowers*. Sompo International's website includes a page stating that it has an office in Chicago, Illinois. However, the "Sompo International" office in Chicago is operated by a Sompo International subsidiary called Endurance Services Limited ("Endurance"), which uses the trade name "Sompo

---

[4] R.39-17. Plaintiffs allege that the Art Institute of Chicago and Yasuda colluded to file a false application with the United States Department of State to obtain assurance that the painting would not be seized as Nazi contraband. Sompo Japan filed a declaration refuting this factual allegation. R.58-2, ¶ 17.

[5] R.39-8.

International" and the Sompo International logo to sell insurance in Illinois.[6] None of the defendants directly write insurance or do business in Illinois.[7]

In 2022, the plaintiffs, through their counsel, contacted Sompo Holdings and requested a meeting to discuss and settle their claim to *Sunflowers*. Sompo Holdings refused the meeting, expressing doubt about the jurisdiction of Illinois courts and the applicability of United States law. This lawsuit followed.

### B.  Proceedings in the District Court

The plaintiffs brought this action in the United States District Court for the Northern District of Illinois. They sought the recovery of *Sunflowers* (or alternatively, the current fair value of the painting), damages, and injunctive relief. For our analysis, their claims may be categorized in two groups. The first group contains state law claims for replevin (Count I),

---

[6] R.72-1, ¶¶ 9, 10; R.39-6.

[7] Defendants support this claim with a series of declarations, which the plaintiffs have not refuted. *See* R.58-1; R.58-2; R.58-3; R.58-4. As stated above, the Sompo corporate family does include at least one entity, Endurance, that sells insurance within Illinois. According to the defendants, Endurance is an indirect subsidiary of Sompo International. R.72-1, ¶ 10. Endurance sells insurance under the tradename "Sompo International" and leases office space in Chicago, Illinois for that purpose. Federal due process does not permit personal jurisdiction premised on corporate affiliation alone "where corporate formalities are substantially observed and the parent does not exercise an unusually high degree of control over the subsidiary." *Cent. States, Se. & Sw. Areas Pension Fund v. Reimer Express World Corp.*, 230 F.3d 934, 943 (7th Cir. 2000). As explained below, it would make no difference in this case even if Endurance's activities in Illinois could be attributed to one or more of the defendants because the sale of insurance does not relate to the plaintiffs' claims.

conversion (Count II), trover (Count III), imposition of a constructive trust (Count IV), unjust enrichment (Count V), breach of fiduciary duty (Counts VI and VII), and slander of title (Count VIII). The second group contains claims for unjust enrichment and restitution under federal common law (Counts IX and X) and also invokes what it terms the court's "Plenary Equitable Authority … under Article III, Section 2 of the U.S. Constitution" (Counts XI and XII).

With respect to the timeliness of their claims, the plaintiffs relied entirely on the federal Holocaust Expropriated Art Recovery Act of 2016, Pub. L. No. 114-308, 130 Stat. 1524 (2016) ("HEAR Act"). The HEAR Act preempts state and federal statutes of limitations for civil claims to recover artwork lost between 1933 and 1945 because of Nazi persecution. *Id.* §§ 4(3), 5(a). The Act allows litigants to bring such civil claims within six years of the actual discovery of the identity and location of the artwork and of a plaintiff's possessory interest in the artwork. *Id.* § 5(a). However, the HEAR Act does not itself supply a cause of action. *Id.* § 5(f).

The defendants moved to dismiss the complaint. They argued a lack of standing, a lack of subject matter jurisdiction, a lack of personal jurisdiction, and *forum non conveniens*. After ruling that the plaintiffs had standing, the district court dismissed all the claims. It first turned to the second group of claims and dismissed Counts IX, X, XI, and XII for lack of federal subject matter jurisdiction. It concluded that no such claims existed under federal common law because the plaintiffs had failed to show that there was a conflict between federal policy and Illinois state law. Moreover, continued the court, the invocation of the court's "plenary equitable

authority" did not permit it to hear claims that do not arise under federal law or diversity jurisdiction.

The court then turned to the counts in the first group. By way of a footnote, it held that the HEAR Act's extension of the state limitations period for these state claims was sufficient to vest the district court with federal subject matter jurisdiction. In that respect, it expressed agreement with the decision of the United States District Court for the Eastern District of Pennsylvania in *Holtzman as Trustee of Elizabeth McManus Holtzman Irrevocable Trust v. Philadelphia Museum of Art*, No. 22-cv-0122, 2022 WL 2651851, at *7 (E.D. Pa. July 7, 2022). In that case, the Pennsylvania district court had held that the extension of a state limitations period for a cause of action pursuant to the HEAR Act was sufficient to vest a district court with federal question jurisdiction. The Pennsylvania district court reasoned that the vindication of the plaintiffs' state law claims depended on the interpretation and application of the HEAR Act, a task that presented substantial issues of federal law. In this case, the district court decided in summary fashion that it had federal question jurisdiction over the state-based claims. But it then devoted the bulk of its opinion to determining that it lacked personal jurisdiction over the defendant corporations and that dismissal of Counts I to VIII was therefore appropriate.

## II

## DISCUSSION

The plaintiffs now appeal the district court's judgment. They submit that the district court erred in dismissing Counts IX to XII for lack of subject matter jurisdiction and in dismissing Counts I to VIII for lack of personal jurisdiction. They also

maintain that the court abused its discretion by refusing to permit the plaintiffs to file a second amended complaint. We review de novo the denial of the motion to dismiss; we review the denial of leave to file a second amended complaint for abuse of discretion. We will address these issues in the same order as the district court.

**A.**

As we noted earlier, the district court first addressed the allegations in Counts IX to XII. These counts invoke explicitly the "federal question" jurisdiction of the district court under 28 U.S.C. § 1331, and we therefore must determine whether the district court had the authority to adjudicate these claims on that basis.

We begin with the allegations of the complaint. The plaintiffs set forth claims for restitution and unjust enrichment under federal common law (Counts IX and X). Also, in Counts XI and XII, they seek the same relief under what they describe as the court's "Plenary Equitable Authority … under Article III, Section 2 of the U.S. Constitution."

**1.**

With respect to Counts XI and XII, the plaintiffs take the view that a district court has inherent equitable authority under the Constitution to fashion restitution and unjust enrichment remedies and is deprived of that authority only if Congress negates that authority by prescribing discreet statutory remedies either expressly or by implication. Because the HEAR Act does not expressly deprive the district court of its equitable authority and does not create a discreet statutory remedy, they continue, the court retains the equitable authority to issue unjust enrichment and restitution remedies.

We cannot accept the plaintiffs' view. It overlooks the fundamental principle that a federal court has no authority to imply a remedy unless that remedy is predicated on a cognizable cause of action. *See Davis v. Passman*, 442 U.S. 228, 239 (1979) ("If a litigant is an appropriate party to invoke the power of the courts, it is said that he has a 'cause of action' under the statute, and that this cause of action is a necessary element of his 'claim.' So understood, the question whether a litigant has a 'cause of action' is analytically distinct and prior to the question of what relief, if any, a litigant may be entitled to receive."); *cf. Commodity Futures Trading Comm'n v. Schor*, 478 U.S. 833, 848 (1986) ("Article III does not confer on litigants an absolute right to the plenary consideration of every nature of claim by an Article III court.").

Here, the text of the statute is clear: "Nothing in this Act shall be construed to create a civil claim or cause of action under Federal or State law." HEAR Act § 5(f). It clearly would be inconsistent with the text and design of the statute to find an implied federal cause of action.[8] If there is no federal cause of action, there can be no implied remedy.

**2.**

Counts IX and X fare no better. Decades of case law firmly establish that federal courts can create federal common law only when "strict conditions" are satisfied. *Rodriguez v. Fed. Deposit Ins. Corp.*, 589 U.S. 132, 135–36 (2020). Federal common law must either be authorized by Congress or "necessary to protect uniquely federal interests." *Id.* at 136 (quoting *Texas*

---

[8] The Court of Appeals for the Second Circuit has refused to create "a federal common law cause of action for replevin" under the HEAR Act. *Zuckerman v. Metropolitan Museum of Art*, 928 F.3d 186, 195, n.9 (2d Cir. 2019).

*Indus., Inc. v. Radcliff Materials, Inc.*, 451 U.S. 630, 640 (1981)). Federal common law is necessary to protect uniquely federal interests when either "the authority and duties of the United States as sovereign are intimately involved" or when "the interstate or international nature of the controversy makes it inappropriate for state law to control." *Texas Indus., Inc.*, 451 U.S. at 641.

Despite these well-established principles, the plaintiffs argue that the district court had subject matter jurisdiction over Counts IX and X, which seek restitution and unjust enrichment under federal common law, because the HEAR Act implicates United States foreign policy. In the plaintiffs' view, *American Insurance Ass'n v. Garamendi*, 539 U.S. 396, 420–25 (2003), supports their contention that the HEAR Act implicates United States foreign policy. In that case, the Supreme Court determined that a California law imposing economic sanctions on insurers to the benefit of Holocaust-era insurance claimants undermined the President's authority where the President already had entered into specific agreements with Germany and Austria to address Holocaust-era insurance claimants. The Court explained that the resolution of insurance claims held by United States residents against foreign nations has long been considered to fall within the executive responsibility over foreign affairs. *Id.* at 420 (citing *Dames & Moore v. Regan*, 453 U.S. 654, 679 (1981)). The Court stated further that the "exercise of the federal executive authority means that state law must give way where, as here, there is evidence of clear conflict between the policies adopted by the two." *Id.* at 421.

So too, when state law clearly conflicts with a specific foreign policy of the United States, state law cannot control. For

instance, in *Ungaro-Benages v. Dresdner Bank AG*, 379 F.3d 1227 (11th Cir. 2004), the Eleventh Circuit applied federal common law because there was an executive agreement between the United States and Germany addressing litigation against German companies arising from the Nazi era. *Id.* at 1233. Because the state law at issue conflicted with that executive agreement, federal common law applied.

However, when there is no evidence that the application of state law would interfere with the foreign policy of the United States, state law can govern the dispute. *Von Saher v. Norton Simon Museum of Art at Pasadena*, 754 F.3d 712 (9th Cir. 2014), articulates firmly that principle. Although the court described United States policy on the restitution of Nazi-looted art,[9] it explicitly held that under *Garamendi*, the plaintiff's state law restitution and conversion claims were not preempted by federal law and that the state law at issue did not conflict with United States foreign policy on Nazi-

---

[9] "In sum, U.S. policy on the restitution of Nazi-looted art includes the following tenets: (1) a commitment to respect the finality of 'appropriate actions' taken by foreign nations to facilitate the internal restitution of plundered art; (2) a pledge to identify Nazi-looted art that has not been restituted and to publicize those artworks in order to facilitate the identification of prewar owners and their heirs; (3) the encouragement of prewar owners and their heirs to come forward and claim art that has not been restituted; (4) concerted efforts to achieve expeditious, just and fair outcomes when heirs claim ownership to looted art; (5) the encouragement of everyone, including public and private institutions, to follow the Washington Principles; and (6) a recommendation that every effort be made to remedy the consequences of forced sales." *Von Saher v. Norton Simon Museum of Art at Pasadena*, 754 F.3d 712, 721 (9th Cir. 2014).

expropriated art. *Von Saher*, 754 F.3d at 723–24.[10] The Ninth Circuit noted that, unlike in *Garamendi*, there was no Holocaust-specific state legislation at issue, no claim for relief against a foreign government, and the defendant museum "had no connection to the wartime injustices committed." *Id.*

In sum, the plaintiffs have established that United States foreign policy supports, as a general proposition, restitution of Nazi-looted art between private parties. However, they have not established that state law causes of action necessarily conflict with that United States foreign policy in a way that requires the application of federal common law rather than state law.[11]

---

[10] The Ninth Circuit was tasked with determining whether the plaintiff's lawsuit, which sought conversion and replevin under a state statute of general applicability, undermined the federal policy on the restitution of Nazi-expropriated art by challenging a foreign nation's determination as to the ownership of the painting at issue. *Id.* at 719.

[11] The plaintiffs discuss the Terezin Declaration, but they have failed to demonstrate any conflict between it and state law. In 2009, the United States participated in the Holocaust Era Assets Conference, resulting in the Terezin Declaration, which in part represented a commitment to "ensure that their legal systems or alternative processes, while taking into account the different legal traditions, facilitate just and fair solutions with regard to Nazi-confiscated and looted art, and to make certain that claims to recover such art are resolved expeditiously and based on the facts and merits of the claims and all the relevant documents submitted by all parties." Prague Holocaust Era Assets Conference, *Terezin Declaration* (June 30, 2009), https://www.state.gov/prague-holocaust-era-assets-conference-terezin-declaration. Unlike the agreement between the United States and Germany in *Ungaro-Benages v. Dresdner Bank AG*, 379 F.3d 1227 (11th Cir. 2004), there is no apparent conflict between the United States's commitment in the Terezin Declaration and the application of state law as envisioned by the HEAR Act.

Moreover, here we have an explicit congressional expression of confidence in the capacity of state law to address the matter effectively without undue interference with the conduct of the Country's foreign policy. Congress enacted the HEAR Act to ensure the availability of state law claims to plaintiffs who would otherwise have no such recourse because of the state statutes of limitations. HEAR Act § 2(6)–(7). In doing so, it specifically stated that the purpose of the HEAR Act is to "ensure that laws governing claims to Nazi-confiscated art and other property further United States policy as set forth in the Washington Conference Principles on Nazi Confiscated Art, the Holocaust Victims Redress Act, and the Terezin Declaration." HEAR Act § 3(1). There can be no serious doubt that Congress has made the judgment that reliance on claims based on state law was consistent with these United States foreign policy objectives.

The district court properly dismissed Counts IX to XII. These claims do not implicate the federal question jurisdiction of the district court.

## B.

### 1.

We now turn to the allegations in Counts I to VIII. As we noted earlier, relying on the analysis of the Eastern District of Pennsylvania in *Holtzman as Trustee of Elizabeth McManus Holtzman Irrevocable Trust v. Philadelphia Museum of Art*, No. 22-cv-0122, 2022 WL 2651851, at *7 (E.D. Pa. July 7, 2022), the district court held summarily that it had federal question jurisdiction over these state law claims. This determination is not contested by the parties and, consequently, it has not been briefed before us.

Our usual first task is to undertake an independent investigation of our subject matter jurisdiction over each count before us. Here, however, where the subject matter jurisdiction question involves an "unruly"[12] doctrine on which we have little independent analysis by the district court and no appellate briefing by the parties, we believe that the most prudent course is to decide this case on the alternate ground of lack of personal jurisdiction over the parties. *See Ruhrgas AG v. Marathon Oil Co.*, 526 U.S. 574, 585 (1999). The personal jurisdiction question is squarely presented, elaborately discussed by the district court and the parties, and susceptible to easy resolution.

**2.**

We review de novo a district court's dismissal for lack of personal jurisdiction. *Curry v. Revolution Lab'ys, LLC*, 949 F.3d 385, 392–93 (7th Cir. 2020). We must accept all well-pleaded facts alleged in the complaint as true and resolve any factual disputes in the plaintiffs' favor. *Felland v. Clifton*, 682 F.3d 665, 672 (7th Cir. 2012). The plaintiffs bear the burden of establishing personal jurisdiction, but when the issue is raised on a motion to dismiss, that burden is met by making a *prima facie* showing of jurisdictional facts. *Curry*, 949 F.3d at 393.

When no federal statute authorizes nationwide service of process, personal jurisdiction is governed by the law of the forum state, which in this case is Illinois. *Tamburo v. Dworkin*, 601 F.3d 693, 700 (7th Cir. 2010). Illinois's long-arm statute

---

[12] *Gunn v. Minton*, 568 U.S. 251, 258 (2013).

allows for personal jurisdiction to the full extent authorized by the Illinois and United States Constitutions.[13]

To satisfy due process, a foreign defendant must have sufficient contacts with a forum to ensure that the exercise of personal jurisdiction over that defendant would "not offend traditional notions of fair play and substantial justice." *International Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945) (internal quotation and citation omitted). There are two types of personal jurisdiction: general and specific. The parties agree that the district court cannot exercise general personal jurisdiction

---

[13] The Illinois Constitution provides that personal jurisdiction is proper "only when it is fair, just, and reasonable to require a nonresident defendant to defend an action in Illinois, considering the quality and nature of the defendant's acts which occur in Illinois or which affect interests located in Illinois." *Rollins v. Ellwood*, 565 N.E.2d 1302, 1316 (Ill. 1990); ILL. CONST. art. 1, § 2; *RAR, Inc. v. Turner Diesel, Ltd.*, 107 F.3d 1272, 1276 (7th Cir. 1997) (quoting *Rollins*, 565 N.E.2d at 1316). We have previously observed that the Illinois Due Process Clause is, at least hypothetically, more restrictive than the Fourteenth Amendment Due Process Clause. *RAR, Inc.*, 107 F.3d at 1276 ("The Illinois Supreme Court has made clear that the Illinois due process guarantee is not necessarily co-extensive with federal due process protections."); *Illinois v. Hemi Group LLC*, 622 F.3d 754, 757 (7th Cir. 2010). Thus, it is possible that the federal constitution would permit personal jurisdiction in a situation where the Illinois Constitution would not. However, no arguments to that effect have been raised in this case. For purposes of our present analysis, if jurisdiction is not available under the federal constitutional standard, it will not be available under the Illinois standard. *KM Enters., Inc. v. Global Traffic Techs., Inc.*, 725 F.3d 718, 732 (7th Cir. 2013). Therefore, it is only necessary to conduct the federal analysis, *id.*, and the only relevant inquiry is whether the exercise of personal jurisdiction is permissible under the Due Process Clause of the Fourteenth Amendment.

over the defendants. Therefore, we need to address only whether specific personal jurisdiction is proper.

Recently, in *B.D. ex rel. Myers v. Samsung SDI Co.,* 143 F.4th 757, 765 (7th Cir. 2025), we began our examination of the requirements for exercising specific personal jurisdiction by setting forth the Supreme Court's long-standing articulation of the basic judicial undertaking: "Whether specific personal jurisdiction exists turns on 'the relationship among the defendant, the forum, and the litigation.'" *Id.* (quoting *Walden v. Fiore,* 571 U.S. 277, 283–84 (2014)).[14] We further noted that we,

---

[14] The phrase "the relationship among the defendant, the forum, and the litigation" has been the analytical touchstone of the Supreme Court's exploration of the due process limitations on a state's exercise of personal jurisdiction for many years. Among contemporary cases, *Shaffer v. Heitner*, 433 U.S. 186 (1977), was the first occasion where we encountered the Supreme Court's use of this phrase. *Id.* at 204 ("Thus, the relationship among the defendant, the forum, and the litigation, rather than the mutually exclusive sovereignty of the States on which the rules of *Pennoyer* rest, became the central concern of the inquiry into personal jurisdiction."). *See also Rush v. Savchuk*, 444 U.S. 320, 327 (1980) ("In determining whether a particular exercise of state-court jurisdiction is consistent with due process, the inquiry must focus on 'the relationship among the defendant, the forum, and the litigation.'" (quoting *Shaffer*, 433 U.S. at 204)); *Calder v. Jones*, 465 U.S. 783, 788 (1984) ("In judging minimum contacts, a court properly focuses on 'the relationship among the defendant, the forum, and the litigation.'" (quoting *Shaffer*, 433 U.S. at 204)); *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 414 (1984) ("When a controversy is related to or 'arises out of' a defendant's contacts with the forum, the Court has said that a 'relationship among the defendant, the forum, and the litigation' is the essential foundation of in personam jurisdiction." (quoting *Shaffer*, 433 U.S. at 204)); *Keeton v. Hustler Mag., Inc.*, 465 U.S. 770, 775 (1984) ("In judging minimum contacts, a court properly focuses on 'the relationship among the defendant, the forum, and the litigation.'" (quoting *Shaffer*, 433 U.S. at 204)); *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472 (1985) ( … continued)

along with other circuits, have distilled this basic guidance
into a more practical application. First, the defendant must
"purposefully avail itself of the privilege of conducting activi-
ties within the forum State, thus invoking the benefits and
protections of its laws." *Id.* (quoting *Hanson v. Denckla*, 357
U.S. 235 (1958)) (citation modified). Second, there must be an
adequate connection between the defendant's activities in the
forum and the suit, such that the suit "arise[s] out of or re-
late[s] to" the forum contacts. *Id.* at 766 (quoting *Bristol-Myers
Squibb Co. v. Superior Ct.*, 582 U.S. 255, 262 (2017)). Third, per-
sonal jurisdiction must accord with notions of fairness. *Id.* The
approach set forth in *Samsung* must guide our present task of
assessing whether the district court had personal jurisdiction
over the Sompo entities.

---

("Where a forum seeks to assert specific jurisdiction over an out-of-state
defendant who has not consented to suit there, this 'fair warning' require-
ment is satisfied if the defendant has 'purposefully directed' his activities
at residents of the forum, and the litigation results from alleged injuries
that 'arise out of or relate to' those activities." (internal citations omitted)
(first quoting citing *Keeton*, 465 U.S. at 774; and then *Helicopteros Nacionales
de Colombia, S.A.*, 466 U.S. at 414)); *Walden v. Fiore*, 571 U.S. 277, 283–84
(2014) ("The inquiry whether a forum State may assert specific jurisdiction
over a nonresident defendant focuses on the relationship among the de-
fendant, the forum, and the litigation." (citation modified)); *Daimler AG v.
Bauman*, 571 U.S. 117, 126 (2014) ("Following *International Shoe*, 'the rela-
tionship among the defendant, the forum, and the litigation, rather than
the mutually exclusive sovereignty of the States on which the rules of *Pen-
noyer* rest, became the central concern of the inquiry into personal juris-
diction.'" (quoting *Shaffer*, 433 U.S. at 204)); *Ford Motor Co. v. Montana
Eighth Jud. Dist. Ct.*, 592 U.S. 351, 371 (2021) ("For all the reasons we have
given, the connection between the plaintiffs' claims and Ford's activities
in those States—or otherwise said, the 'relationship among the defendant,
the forum[s], and the litigation'—is close enough to support specific juris-
diction." (quoting *Walden*, 571 U.S. at 284)).

On the facts before us, the second consideration articulated in *Samsung* provides the key guidance: There must be an adequate connection between the defendants' activities in the forum and the suit, such that the suit "arise[s] out of or relate[s] to" the forum contacts. *Id.* (quoting *Bristol-Myers Squibb Co.*, 582 U.S. at 262). In *Ford Motor Co. v. Montana Eighth Judicial District Court*, 592 U.S. 351 (2021), the Supreme Court clarified that such contacts do not need to have a strict causal relationship with the litigation. *Id.* at 361–62. It explained that the first half of the standard ("arise out of") relates to causation, while the second half ("relates to") "contemplates that some relationships will support jurisdiction without a causal showing." *Id.* at 362. Ford Motor Company admitted that it had purposefully availed itself of the forum through advertising, selling, and servicing its vehicles there. *Id.* at 361. It contested, however, personal jurisdiction on the basis that those contacts did not relate to the case at issue, which involved an accident in the forum state involving a Ford car that was purchased outside of the forum state. *Id.* at 355, 361. The Supreme Court held that personal jurisdiction was proper because the volume and nature of Ford's contacts with the forum were designed to induce consumers in that forum to engage in the type of behavior from which the case arose. *Id.* at 367.

Applying *Ford* in our *Samsung* decision, we pointed out that one of the limits of the "relates to" prong is the concept of "fair warning—knowledge that a particular activity may subject [the defendant] to the jurisdiction of a foreign sovereign." *Samsung SDI Co.*, 143 F.4th at 771 (quoting *Ford*, 592 U.S. at 360). We made clear that the defendants' activities in the forum must give them clear notice of the particular type of claims the plaintiffs are bringing. *Id.* at 771–72.

If the activities of its Illinois subsidiary could be imputed to Sompo International, it might reasonably foresee that it may be compelled to answer in an Illinois court for matters emanating from the operation of an office in Illinois. The existence of an office and the sale of insurance would give Sompo International clear notice, for example, of lawsuits relating to its office lease, its various employment agreements for Illinois-based employees, and the sale of their insurance products. However, these activities do not give clear notice to Sompo International that it may be sued over the ownership of a painting that its parent company purchased in Europe and regularly displays in Japan. *See Advanced Tactical Ordinance Sys., LLC v. Real Action Paintball, Inc.*, 751 F.3d 796, 801 (7th Cir. 2014) ("Specific jurisdiction must rest on the *litigation-specific* conduct of the defendant in the proposed forum state.").[15]

The plaintiffs argue that insurance sales are related to *Sunflowers* because the defendants use *Sunflowers* to market their business. They submit that, under the prudent investor rule, Sompo Japan could not have purchased *Sunflowers* unless that purchase was "calculated to help Sompo market insurance."[16]

---

[15] For the same reason, websites operated by Sompo Holdings and Sompo International do not provide the necessary litigation-related contacts. Even if these websites were used to sell insurance products to Illinois residents, see *NBA Properties, Inc. v. HANWJH*, 46 F.4th 614, 624 (7th Cir. 2022), that forum-related activity has no relevance to the claims in this litigation. The mere fact that an Illinois consumer can view an image of *Sunflowers* on the Sompo Holdings website does not change this conclusion. The display of an image of the painting on that website has no relation to any of the plaintiffs' claims.

[16] Plaintiffs' Reply Br. at 16.

Here, the plaintiffs argue for far too broad an application of the "arise out of or relates to" requirement. If such were the rule, then specific personal jurisdiction would exist over a corporation anywhere it did any business because its business would "relate to" all other acts of the corporation. Such reasoning simply cannot live in peace with *Walden*, *Ford*, and *Samsung*.

Wherever the plaintiffs' alleged injury occurred, it did not occur in Illinois. The exhibition in Chicago is only relevant to the extent that it facilitated Sompo Japan's sale of insurance in Illinois. But Sompo Japan sells no insurance in Illinois. Accordingly, the exhibition in Illinois does not create personal jurisdiction over Sompo Japan.[17] The exhibition in Illinois

---

[17] While not binding on this court, two cases discussed by the parties help to demonstrate this issue. In *Barzilai v. Museum*, No. 153086/2022, 2022 WL 16856131, at \*1–2 (N.Y. Sup. Ct. Nov. 10, 2022) a New York state court refused to exercise personal jurisdiction over the Israel Museum in an action for replevin and conversion of the Bird's Head Haggadah, which was stolen from its Jewish owner in the 1930s. Despite the fact that the Bird's Head Haggadah was displayed at an art exhibition at the New York Public Library for approximately four months in 1988 and 1989, the court found that due process would not permit the exercise of jurisdiction because "[w]hatever business the Israel Museum may engage in within New York, it is not substantially related to the claims asserted in the first two causes of action, that arose out of a theft and subsequent sale far away from New York." *Id.* at \*3. Similarly, in *Graff v. Leslie Hindman Auctioneers, Inc.*, 342 F.Supp.3d 819, 826 (N.D. Ill. 2018), vacated on other grounds, No. 17 C 6748, 2019 WL 13196397 (N.D. Ill. Feb. 12, 2019), the district court found no personal jurisdiction over a conversion claim where the defendant exercised dominion or control over two paintings in Arizona and later tried to auction them off in Illinois. Because the injury took place in Arizona, the subsequent auction in Illinois did not relate to Graff's claims. *Id.* (citing *Charash v. Oberlin Coll.*, 14 F.3d 291, 297 (6th Cir. 1994)). Contrary to the
( … continued)

does not relate to the plaintiffs' conversion claim because the conversion was completed before the exhibition. Moreover, the parties agree that the painting was obtained by Sompo Japan's corporate predecessor in London. Accordingly, plaintiffs' alleged injuries for conversion and trover occurred in London.[18] The place of injury for plaintiffs' slander of title claims is most likely their domicile, which would be Germany and Sweden, so the defendants' actions leading to that injury and the injury itself occurred outside of Illinois.[19] In other words, Sompo Japan's relevant conduct, and the effects of that conduct, occurred in various European countries, rather than Illinois.

The place of injury for unjust enrichment is the place where the plaintiffs allegedly conferred the benefit on the defendant. *In re Sears, Roebuck & Co. Tools Mktg. & Sales Pracs. Litig.*, Nos. 05 C 4742 & 05 C 2623, 2006 WL 3754823, at *2 (N.D. Ill. Dec. 18, 2006). Plaintiffs allege that Sompo Japan's

---

plaintiffs' arguments, the fact that these cases did not deal with Nazi confiscation does not undermine their explanatory value here.

[18] The place of injury for conversion is the place where the property was converted by the defendant. *Charash*, 14 F.3d at 297. It is not clear where the breach of a duty to render aid to a tort victim occurs, but it was certainly not in Illinois. Typically, this duty attaches immediately upon committing the tort that renders the victim in need of aid. Restatement (Second) of Torts § 322 (A.L.I. 1965). Presumably, the injury occurs where the tortfeasor fails to act to prevent further harm. *Id.*; *see Taylor v. Meirick*, 712 F.2d 1112, 1117 (7th Cir. 1983).

[19] The place of injury for slander of title is typically the domicile of the plaintiff. *See Peacock v. Merrill*, No. 05-0377, 2009 WL 10704516, at *15 (S.D. Ala. Nov. 17, 2009) (determining that slander of title occurred in the property owner's domicile because that is where the financial consequences are felt).

predecessor Yasuda "commercially exploited" the painting by placing it in the Chicago exhibition.[20] They also allege in conclusory fashion that their claims for unjust enrichment "arise out of and relate to the commercial wrongdoing of Defendants in bringing the Painting to Illinois and displaying it at the van Gogh Exhibition in 2001"[21] and that Sompo Japan was seeking to "burnish[] its corporate image with the Painting throughout the U.S."[22] The district court concluded correctly that the only benefit that Sompo Japan allegedly received from the exhibition was "a reciprocal promise" from the Art Institute and Van Gogh Museum to lend Van Gogh paintings to an exhibition in Tokyo the following year. Under *Bristol-Myers Squibb*, there is simply an insufficient connection between these claims and Illinois.

Because the defendants' contacts with Illinois are not related to the actions alleged in the complaint, we need not engage in further evaluation of whether the exercise of in personam jurisdiction over the defendants would comport with fair play and substantial justice. *See Samsung SDI Co.,* 143 F.4th at 775.

In summary, the second prong of the *Samsung* test presents a sure path to decision in the present case. There is simply an inadequate connection between the forum (Illinois) and the litigation to permit the exercise of in personam jurisdiction over the defendants. *See Bristol-Myers Squibb Co.,* 582 U.S. at 265. None of the claims here "arise out of or relate to"

---

[20] R.39, ¶ 253.

[21] R.39, ¶ 109.

[22] R.39, ¶ 253.

the exhibition in Illinois. *Id.* at 262 (citation modified); *see also Walden*, 571 U.S. at 291 (Nevada courts lacked jurisdiction because the "relevant conduct occurred entirely in Georgia").[23]

## Conclusion

The judgment of the district court is affirmed. Counts IX to XII present no federal cause of action and, in any event, the district court lacked in personam jurisdiction over the defendants. With respect to Counts I to VIII, we pretermit a ruling on subject matter jurisdiction, see *Ruhrgas AG v. Marathon Oil Co.*, 526 U.S. 574 (1999), and affirm the judgment of the district court on the ground that it lacked in personam jurisdiction over the defendants.

AFFIRMED

---

[23] The plaintiffs also argue that the district court abused its discretion by refusing their request to file a Second Amended Complaint to cure the jurisdictional deficiencies. Although the district court should have applied the more lenient Rule 15(a)(2) standard to their motion, *O'Brien v. Village of Lincolnshire*, 955 F.3d 616, 629 (7th Cir. 2020), its failure to do so here is of no consequence to this case. It is apparent from the district court's opinion dismissing the First Amended Complaint that nothing in the Second Amended Complaint would have altered its decision. R.74 at 22–23, 31; *O'Brien*, 955 F.3d at 629 ("[I]t is apparent from the court's order and from the record that, ultimately, the court did not abuse its discretion."). Nor would anything in the Second Amended Complaint alter this court's decision.